E-FILED
Tuesday, 13 October, 2020  12:04:22 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MICHAEL BOATMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 1:20-cv-01248-JES-JEH |
| | ) | |
| PEORIA AREA ASSOCIATION OF | ) | Honorable Judge James E. Shadid |
| REALTORS, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S MOTION AND SUPPORTING MEMORANDUM
### TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendant Peoria Area Association of Realtors ("PAAR"), by and through its attorneys, respectfully moves pursuant to Fed. R. Civ. P. 12(b)(6) and 19(a) for dismissal of the First Amended Complaint (the "FAC") filed by Plaintiff, Michael Boatman ("Plaintiff" or "Boatman"), or, in the alternative, the mandatory joinder of third party Move, Inc., and in support, states as follows:

### INTRODUCTION

The Court should dismiss Boatman's FAC for five reasons.

First, Boatman's claim is barred by the applicable three-year statute of limitations. 17 U.S.C. § 507(b). Boatman's claim against PAAR is premised entirely upon PAAR's agreement granting Realtors Information Network ("RIN") access to IDX feeds to data in PAAR's real estate multiple listing service ("MLS"), because that agreement purportedly grants rights in PAAR's MLS data that exceeds the scope of licenses that Boatman later granted to his real estate agent clients that uploaded his copyrighted photographs to the PAAR MLS. However, PAAR entered into that agreement with RIN (the "RIN Agreement") way back in June of 1996. Boatman does not allege any other conduct by PAAR that might constitute an act of infringement of Boatman's

copyrights. Boatman also alleges that the last date on which any of his real estate agent clients uploaded any of his copyrighted photos to the PAAR MLS, and in turn were fed to Realtor.com through an IDX feed pursuant to the RIN Agreement, was no later than 2016. These dates are all more than three years before Boatman filed his claims against PAAR, so Boatman's claim against PAAR is barred by the applicable statute of limitations.

Second, Boatman's FAC fails to state a claim against PAAR upon which relief can be granted. To state a claim for copyright infringement, the owner of copyrighted photographs must demonstrate that an operator of an automated website like PAAR's MLS engaged in some volitional conduct that infringed the owner's copyrights. Here, Boatman is not alleging that anyone is actively infringing his copyrights. Although Boatman alleged in his original complaint that Move, Inc. was infringing his copyrights in reliance upon the RIN Agreement, Boatman removed those allegations of infringement by Move, Inc. from his FAC. Boatman now alleges only that the RIN Agreement purports to grant Move, Inc. the right to use the Boatman photos in a manner that might infringe on Boatman's copyrights, without alleging that Move, Inc. or any other party or third-party is actually displaying or copying the photographs in a manner that infringes on Boatman's copyrights. Boatman does not allege that PAAR engaged in any conduct directed to the Boatman photographs at issue here. The only conduct alleged against PAAR is that PAAR entered into a contract with RIN in 1996 that granted RIN certain rights in the PAAR MLS. The mere fact that, 20 years later, Boatman granted only limited rights to use his photos to his real estate agent clients, and that those clients nonetheless chose to upload those copyrighted photos to the PAAR MLS, does not make PAAR liable to Boatman for copyright infringement. Thus, Boatman's FAC fails to state a claim for direct copyright infringement against PAAR.

Third, contrary to Boatman's conclusory allegations, the 1996 RIN Agreement upon which

Boatman bases his claim against PAAR did not grant Move, Inc. the right to use Boatman's photos for purposes other than advertising the photographed properties for sale. The purpose of the RIN Agreement is clearly articulated and confined to the display of information obtained from the PAAR MLS to advertise the photographed properties for sale. On its face, the RIN Agreement does not purport to give RIN (much less Move, Inc., which is not a party or alleged assignee of the agreement) any right to re-display any photographs obtained from the PAAR MLS for purposes other than advertising the properties for sale. Thus, the actual terms of the RIN Agreement, which control over Boatman's conclusory allegations to the contrary, require that Boatman's claims against PAAR be dismissed for failure to state a claim.

Fourth, Rule 19 provides for the joinder of all materially interested parties to protect interested parties and avoid waste of judicial resources. If a party is necessary, it must be joined, if feasible. If it is not feasible, and the claim cannot proceed without them, then the complaint must be dismissed. Boatman's claim against PAAR depends entirely on an alleged contractual relationship between PAAR and Move, Inc., and in turn, Move, Inc.'s purported rights under the contract to wrongfully re-display the photographs in a manner that infringes on Boatman's copyrights. Move, Inc. is necessary to completely adjudicate the claims regarding the construction and interpretation of the 1996 RIN Agreement, and/or whether Move, Inc. has any rights under the 1996 RIN Agreement, and/or whether Move, Inc. has relied upon the 1996 RIN Agreement to re-display Boatman's photographs for purposes that exceed the scope of the licenses granted by Boatman and therefore infringe on Boatman's copyrights. Yet Boatman failed to name Move, Inc. as a defendant party. Because Move, Inc. is a necessary party, Boatman must either add Move, Inc. as a defendant, or his claim must be dismissed.

Finally, a party may not bring a claim against another if that claim had previously reached

finality on the merits and was litigated under an identity of cause of action and parties or their privies. In such cases, the party's claim is barred by *res judicata*. Further, even if the prior litigation of those claims did not reach finality, they must be brought in one action against all culpable parties to avoid dismissal for improper claim splitting. Here, the allegations against PAAR have been alleged and adjudicated by Boatman in at least one prior action (and possibly more) which was dismissed with prejudice pursuant to a settlement in 2018. Before that action was dismissed, the district court in that action held that the licenses Boatman granted to his Peoria area real estate agent clients permitted the real estate agents to upload the copyrighted photographs to the Realtor.com website. Thus, Boatman's attempt to re-assert those claims against PAAR in this subsequent action is barred by *res judicata* and because of Boatman's improper claim splitting.

## SUMMARY OF RELEVANT FACTS

Boatman is a professional photographer who contracts with real estate agents to photograph the interior and exterior of homes to market their sale. (FAC ¶¶ 7, 17, 18.) PAAR is a professional association of Peoria-area real estate agents that maintains an MLS database for its members. (*Id.* at ¶¶ 2, 3.)

Boatman alleges that, during the period from 2012 to 2015, Boatman delivered 1,216 copyrighted photographs to his real estate agent clients in the Peoria area pursuant to limited licenses granting them the rights to use the photographs to advertise and market the properties depicted in the photos during the term of the real estate agents' listing agreements for those properties. (*Id.* at ¶¶ 9-11, 17-24.) Boatman's real estate agent clients in turn uploaded the photos to the MLS operated by PAAR. (*Id.* at ¶ 40.) "[T]hose real estate agent clients selected and organized the Photographs" that they uploaded to the MLS. (*Id.*) As set forth in the PAAR MLS Rules and Regulations attached as Exhibit 3 to Boatman's FAC, PAAR does not verify or edit any

4

of the listing information uploaded to the MLS by Boatman's real estate agent clients. "The information published and disseminated by the Service [the PAAR MLS] is communicated verbatim, without change by the Service, as filed with the Service by the Participant [real estate agent]. The Service does not verify such information and disclaims any responsibility for its accuracy." (FAC Ex. 3 at Page 14, Section 12.2.) The listing information on the PAAR MLS is "fed" by internet data exchange feeds ("IDX") to real estate websites, like Realtor.com, that display MLS listings on the internet. (FAC ¶¶ 42, 64.) Boatman concedes in his FAC that PAAR's grant of IDX feed access to MLS listings to promote the sale of the listed properties was "[i]ncluded in the scope of the license granted by Boatman to his real estate agent clients" and "was consistent with Boatman's license to his real estate agent clients." (*Id.* at ¶¶ 43, 55).

The Boatman photographs at issue were "taken in the years 2012, 2013, 2014, or 2015" and his real estate agent clients "uploaded the Photographs to the MLS operated by PAAR in 2012, 2013, 2014, 2015 or 2016." (*Id.* at ¶¶ 39, 40.) Thus, 2016 was the last date that any Boatman photograph at issue was uploaded to the PAAR MLS and then fed by IDX to the Realtor.com website pursuant to the RIN Agreement.

In his original complaint, Boatman alleged that non-party Move, Inc. re-displayed his copyrighted photographs after the properties were sold and the listings terminated, thereby infringing Boatman's copyrights, and that PAAR was directly liable for such infringement because PAAR purportedly granted RIN, Move, Inc.'s alleged predecessor, rights to re-display information in the PAAR MLS after the properties were sold. However, Boatman removed all those allegations from his FAC. Boatman no longer alleges that Move, Inc. or anyone else is re-displaying his copyrighted photographs in any manner that infringes on Boatman's copyrights.[1] However,

---

[1] The only allegations in Boatman's original complaint that anyone was displaying his copyrighted photographs in any manner that infringed on his copyrights are as follows:

Boatman still seeks to hold PAAR directly liable for copyright infringement (which is no longer alleged to be occurring) merely for entering into a contract with RIN in 1996 that purportedly granted RIN a right to re-display photographs in the PAAR MLS after the properties depicted were sold and the listings terminated. The crux of Boatman's direct infringement claim against PAAR in the FAC consists of the following allegations:

> 57.   The license to the Photographs granted by Boatman to his real estate agent clients excluded rights to copy, display or distribute Boatman's Photographs after the applicable real estate listing was expired, withdrawn or sold.
>
> * * * *
>
> 72.   PAAR entered into an Agreement with non-party REALTORS Information Network, at that time the owner and operator of the Realtor.com website, on June 3, 1996, relating to the display of PAAR's MLS database on the Realtor.com website (the "RIN Agreement").
>
> 73.   At some point after the RIN Agreement was executed, The RIN Agreement with PAAR transferred from non-party REALTORS Information Network to non-party Move, Inc., and has not been terminated or materially changed by any of the parties to date.
>
> 74.   The RIN Agreement did not require the owner or operator of the Realtor.com website to refresh all MLS downloads and IDX displays automatically fed by those downloads over any time frames.
>
> 75.   The RIN Agreement permitted the owner or operator of the Realtor.com website to copy, display or distribute real estate listing information and associated photographs for real estate listings that had expired, been withdrawn or been sold.
>
> 76.   PAAR distributed the MLS database compilations including the preexisting component works protectible by copyright, which preexisting component works included Boatman's Photographs, to Realtor.com pursuant to the RIN Agreement.

---

34. At some point, Realtor.com's practice changed.

35. Realtor.com stopped removing photographs for sold listings after the properties sold.

36. Realtor.com began re-displaying photographs from prior listings after the properties sold.

37. Realtor.com displayed and used Boatman's Photographs after the properties depicted in the Photographs sold and after the listings closed.

38. Realtor.com obtained Boatman's Photographs from PAAR.

39. Realtor.com's display of Boatman's Photographs after the listings closed and the properties sold violated Boatman's license agreements with Boatman's real estate agent clients and infringed his rights under the Copyright Act.

Boatman removed all of the foregoing allegations in his FAC, and no longer alleges that Move, Inc., Realtor.com or anyone else is displaying any of his copyrighted photographs after the listings closed or the properties sold in violation of the licenses Boatman granted to his real estate agent clients.

(FAC at ¶¶ 57 and 72-76.)

Although Boatman's FAC abandons his prior allegations that Move, Inc. violated his copyrights, the claim against PAAR in the FAC is still entirely premised and dependent upon the construction and interpretation of the 1996 RIN Agreement and Boatman's conclusory allegation that the RIN Agreement somehow transferred from RIN to Move, Inc. But Boatman did not name Move, Inc. as a defendant in this action. And despite the fact that Boatman no longer alleges that any third party is violating Boatman's copyrights based on the 1996 RIN Agreement, the crux of Boatman's claim against PAAR remains that "PAAR unilaterally granted rights to third parties that exceeded the scope of Boatman's licenses." (*Id.* at ¶ 82.)

Although the 1996 RIN Agreement is central to the FAC and incorporated into the FAC by reference, Boatman and his counsel conspicuously neglected to attach this document to the FAC. A copy of the contract is attached to this Motion as Exhibit A. Contrary to Boatman's conclusory allegations, the actual terms of the RIN Agreement make it clear that PAAR licensed MLS data to RIN solely for the purpose of advertising properties listed for sale on the MLS. As set forth in the agreement's opening recital, the parties were entering into the agreement "to advertise certain properties offered for sale by various REALTORS®." (Ex. A. at 1, opening recital.) The Realtor.com website (the "RPA") is defined in the agreement as a website operated by RIN "to support property advertising." (Ex. A. at 1, ¶1 definition of RPA.) The data licensed by PAAR to RIN (the "Licensed Data") was "textual data and information *related to a Property*." (Ex. A. at 1, ¶1 definition of Licensed Data (emphasis added)) The Property to which the Licensed Data was so limited is defined as "residential property: house, condominium, townhouse or mobile home, *offered for sale through a REALTOR® and for which Data Provider maintains listing information relating to same.*" (Ex. A. at 1, ¶1 definition of Property (emphasis added).) Thus, the

7

Licensed Data was to encompass properties offered for sale and for which a real estate agent maintains a listing. Indeed, the RIN Agreement contains an express representation and warranty that "***Licensed Data only contains properties that are offered for sale through REALTORS®.***" (Ex. A. at ¶8(b) (emphasis added).)

Boatman also incorrectly alleges that the RIN Agreement did not provide for the IDX feeds to Realtor.com to be refreshed. (FAC ¶ 74.) In fact, the RIN Agreement expressly provided for "updates of the Licensed Data to RIN in an electronic format acceptable to RIN no less frequently than weekly…" (Ex. A at ¶2(b).) Boatman further alleges that Move, Inc. somehow succeeded to RIN's rights under the RIN Agreement without any express assignment authorized by PAAR. (FAC at ¶73.) However, the RIN Agreement specified that "[n]either this Agreement nor any right or obligation arising hereunder may be assigned (voluntarily, by operation of law or otherwise), in whole or in part, by either party without the prior written consent of the other party…" (*Id*. at ¶ 14.)

This is not the first time that Boatman has claimed that someone other than Move, Inc. is liable for Move, Inc.'s display of his photographs beyond the scope permitted by the licenses he granted to his real estate agent customers. In *Boatman v. Honig Realty, Inc.*, Civil Action No. 16-cv-08397 (N.D. Ill. August 26, 2016) (the "*Honig* Action"), an action he filed in the Northern District of Illinois more than four years ago, Boatman made the exact same claim he makes in the present action, but against Defendant Honig, which was a real estate agency that employed some of Boatman's real estate agent customers. In the *Honig* Action, Boatman claimed that it was the real estate agency, Defendant Honig, rather than PAAR, that "uploaded the Registered Photographs to Realtor.com knowing that it unlawfully granted rights in the Registered Photographs to Realtor.com under the Move Terms of Use that far exceeded the scope of Limited

License" that Boatman granted to his real estate agent customers. *See* Boatman Second Amended

Complaint in the *Honig* Action at ¶ 38. A copy of Boatman's Second Amended Complaint in the

*Honig* Action (without the voluminous exhibits) is attached to this motion as Exhibit B (the

"*Boatman v Honig* SAC").

Boatman acknowledged in the *Honig* Action that in order to feed a photograph through the

MLS to Realtor.com, a Peoria-area real estate agent "must first agree to the terms and conditions

of the Peoria Area Association of Realtors' ('PAAR') Multiple Listing Service ('MLS') Rules and

Regulations (the 'PAAR MLS Rules and Regulations') before uploading the photographs to

PAAR's online 'portal,' which photographs are then published on Realtor.com." (Ex. B at ¶39.)

Boatman attached the PAAR MLS Rules and Regulations as an exhibit to his *Boatman v. Honig*

SAC, and further alleged that:

> Defendant Honig-Bell agreed to the PAAR MLS Rules and Regulations,
> which PAAR MLS Rules and Regulations provide:
>
> By the act of submitting any property listing content to the MLS, **the
> participant represents that he has been authorized to grant and also
> thereby does grant authority for the MLS to include the property
> listing content in its copyrighted MLS compilation and also in any
> statistical report on comparables**. Listing content includes, but is not
> limited to, photographs, images, graphics, audio and video recordings,
> virtual tours, drawings, descriptions, remarks, narratives, pricing
> information, and other details or information related to the listed property.
> (PAAR MLS Rules and Regulations, Section 13 (emphasis added); see also
> id. at Section 13.1 ("All right, title, and interest in each copy of every
> multiple listing compilation created and copyrighted by the Peoria Area
> Association of REALTORS® (PAAR) and in the copyrights therein, shall
> at all times remain vested in the Peoria Area Association of
> REALTORS®.").)

(Ex. B, *Boatman v. Honig* SAC ¶ 40 (emphasis in original).) Boatman attached the very same

PAAR Rules and Regulations to his FAC in this action. (FAC Ex. 3.)

Moreover, Boatman understood as early as September 2015 that PAAR required real

estate agents to transfer copyrights to PAAR of the photographs uploaded to the PAAR MLS, even if the agents did not have the authority to do so. In an action Boatman filed in this district in January 2017, captioned *Boatman v. Kepple Premier Real Estate, LLC, et al.*, Civil Action No. 17-cv-01009-MMM-JEH (the "*Kepple* Action"), Boatman alleged that he understood and was concerned as early as September of 2015 that PAAR required "that realtors transfer copyrights of uploaded photographs to PAAR even though the agents do not have authority to do so." *See* January 9, 2017 Complaint in the *Kepple* Action, a copy of which (without voluminous exhibits) is attached hereto as Exhibit C, at ¶20. Boatman further complained in the *Kepple* Action that infringing copies of his photographs with the PAAR watermark were being distributed on the PAAR MLS and through the PAAR MLS to Realtor.com and other real estate websites. (Ex. E at ¶¶ 25-26.)

Thus, Boatman acknowledged in both the August 2016 *Honig* Action and the January 2017 *Kepple* Action that PAAR was acting in the same middle-man role he alleges that PAAR occupies in the present action. Boatman alleges in all three actions that Boatman's real estate agent customers upload his copyrighted photographs to the PAAR MLS, and from there they get uploaded to Realtor.com. The photographs that Boatman displayed in both the *Boatman v. Honig* SAC and the *Kepple* Action complaint contained the PAAR watermark. (*See, e.g.,* Ex. B at ¶ 25 and Ex. C at ¶ 25.) Both the *Honig* Action and the *Kepple* Action also involved may of the same properties and copyright registrations at issue in this action. In the present action, Boatman essentially alleges that all his photographs uploaded by his real estate agent clients to the PAAR MLS automatically were infringed, without any intent or directed action by PAAR, by operation of the RIN Agreement because PAAR back in 1996 had granted RIN rights in the PAAR MLS data that exceed the scope of the licenses that Boatman would later grant to his real estate agent

clients.

Yet, despite Boatman's knowledge of all this by at least August 2016, Boatman did not name either PAAR or Move, Inc. as defendants in the *Honig* Action that Boatman filed in August 2016. Instead, Boatman attempted to split his claims against the various parties involved in the process of uploading Boatman's photos to the Realtor.com website. Boatman first sued Honig in August 2016. In November 2018, Boatman settled with Honig and dismissed his claims in the *Honig* Action with prejudice. A copy of the November 18, 2018 Stipulation of Dismissal with Prejudice in the *Honig* Action is attached as Exhibit D. Before Boatman settled and dismissed the *Honig* Action, the district court in that case found as a matter of law that the licenses Boatman granted to his Peoria area real estate agent clients permitted the real estate agents to upload the copyrighted photographs to the Realtor.com website, and that "Honig acted within the scope of its license when it uploaded the photographs and did not directly infringe Boatman's copyright." *See* September 5, 2017 Memorandum Opinion at Order in the *Honig* Action, a copy of which is attached hereto as Exhibit E, at 4-5.

## ARGUMENT

Under Rule 12(b)(6), a court should dismiss a plaintiff's complaint when the factual allegations fail to state a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 560-61 (2007). A complaint that contains no more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," or that fails to allege "more than the mere possibility of misconduct," fails to meet the liberal pleading standard of Rule 8. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "The complaint must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Frazier v. U.S. Bank Nat. Assn.,* 2013 WL 1337263, at *2 (N.D. Ill. Mar. 9, 2013) (quotations and citations

omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Martin v. Direct Wines, Inc*., 2015 WL 4148704, at *1 (N.D. Ill. Jul. 9, 2015) (quoting *Twombly*, 550 U.S. at 556). "In reviewing the sufficiency of a complaint under the plausibility standard…[courts] need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Martin,* 2015 WL 4148704, at *1 (quotations omitted). Conclusions of fact and law may be disregarded because "they are…not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

## I.    Boatman's claim against PAAR is barred by the applicable statute of limitations.

The Copyright Act, 17 U.S.C. § 507(b) provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." The Supreme Court noted that a copyright claim arises or accrues when an infringing act occurs. *Petrella v. Metro-Goldwyn-Mayer, Inc.,* 572 U.S. 663, 670 (2014). Here, based on Boatman's FAC, the infringing act he attributes to PAAR was it entering into an agreement with RIN for display of the information related to real estate listings offered for sale. The RIN Agreement was executed in June of 1996, more than 24 years before this action was filed.

Boatman alleges that his real estate agent clients uploaded his copyrighted photographs to the PAAR MLS and that such upload was a permissible use of the photos within the scope of the licenses he granted to his clients. Boatman contends, however, that PAAR's distribution of its MLS database compilation, which at various points in 2012 through 2016 included the Boatman copyrighted photographs, by IDX feed to Realtor.com pursuant to the RIN Agreement infringed on his copyrights merely because the RIN Agreement could be construed to permit RIN or Move, Inc. as its alleged successor to use his photographs in a manner that exceeded the scope of his

licenses to the real estate agent clients. However, Boatman no longer alleges that Move, Inc. is infringing his copyrights by re-displaying his photos. Boatman alleges that the last IDX feed of Boatman's photos occurred by no later than 2016, which is more than three years prior to Boatman's filing of the present action. (FAC ¶ 40.) Thus, Boatman's claim against PAAR accrued no later than 2016 and is barred by the applicable three year statute of limitations.

Boatman cannot be heard to argue that he did not know or have cause to know sufficient facts in 2016 to bring his claim against PAAR. Boatman had sufficient knowledge and facts in August of 2016 to assert his identical claims against Honig. Boatman also understood as early as September 2015 that PAAR required its real estate agent members to assign to PAAR copyrights in the photos they uploaded to the PAAR MLS even if the agents did not have the power to do so, and that his copyrighted photos were being distributed from and through the PAAR MLS in a manner that Boatman believed to exceed the scope of the licenses he granted to his real estate agent customers. But in an effort to separately recover against first Honig and Kepple, and then against Move, Inc. and now against PAAR, Boatman made the calculated decision to delay bringing any claim against either Move, Inc. or PAAR. After settling and dismissing with prejudice his 2016 action against Honig in November 2018, Boatman went after Move, Inc. in 2019. After resolving the claim against Move, Inc., Boatman then came after PAAR in 2020. However, because Boatman waited more than three years after the last of his copyrighted photographs were fed through the PAAR MLS to the Realtor.com website to bring this action, any claim Boatman may have against PAAR is barred by the applicable statute of limitations.

## II.     Boatman's FAC fails to state a claim for copyright infringement because he does not allege any infringement, or that PAAR was the cause of any infringement.

To state a claim for copyright infringement against PAAR, Boatman must plausibly allege that: (1) Boatman owns a valid copyright in the photos at issue, and (2) that PAAR violated at least

one exclusive right granted to Boatman under 17 U.S.C. § 106.  *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir.), *cert. denied*, 140 S. Ct. 122, 205 L. Ed. 2d 41 (2019). Boatman contends that PAAR, by distributing the PAAR MLS data that contains Boatman's copyrighted photos pursuant to the 1996 RIN Agreement, infringed on Boatman's exclusive right to distribute his copyrighted photos under 17 U.S.C. § 106(3).  However, PAAR did not select the Boatman photos for distribution.  Boatman's real estate agent customers selected those photos for distribution.

A copyright plaintiff must also establish causation by the defendant, which is commonly referred to as the "volitional-conduct requirement." *Id.* (*citing Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017)). Direct liability must be premised on conduct that can reasonably be described as the direct cause of the infringement. *Id.* "This prerequisite takes on greater importance in cases involving automated systems," like the PAAR MLS. *Id.* This issue "comes right to the fore when a direct-infringement claim is lodged against a defendant who does nothing more than operate an automated, user-controlled system. . .Most of the time that issue will come down to who selects the copyrighted content: the defendant or its customers." *Id.* (*quoting Am. Broad Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 453 (2014) (Scalia, J., dissenting)).

As stated by the Ninth Circuit in *Giganews*,[2] direct copyright liability for website owners arises when they are actively involved in the infringement, and the distinction between active and passive involvement in the alleged infringement is central to the legal analysis. *Giganews*, 847 F.3d at 667; *see also, CoStar Grp, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004). Indirect activities, such as automatic copying, storage, and transmission of copyrighted materials, when

---

[2] The Seventh Circuit and the Northern District of Illinois have relied on the Ninth Circuit's analysis in several copyright infringement cases that involved plaintiff Perfect 10, Inc. and its claims against defendants related to the display of Perfect 10's copyrightable material on various websites. *See e.g. Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012); *Bell v. Chi. Cubs Baseball Club, LLC*, 2020 WL 550605 (N.D. Ill. Feb. 4, 2020); *GC2 Inc. v. Intl. Game Tech. PLC*, 255 F. Supp. 3d 812 (N.D. Ill. 2017).

instigated by others, do not render a website service strictly liable for copyright infringement. *Giganews*, 847 F.3d at 670. To demonstrate volitional conduct, a plaintiff must provide some evidence showing the defendant exercised control (other than by general operation of its website); selected material for upload, download, transmission, or storage; or instigated any copying, storage or distribution of its photos. *VHT, Inc.*, 918 F.3d at 732 (citing *Giganews*, 847 F.3d at 666, 670).

In his FAC, Boatman attempted to remedy the volitional conduct deficiencies in his claim against PAAR by repeatedly using the word "volition" in his description of the manner in which PAAR operated its MLS. However, to satisfy the volition requirement, Boatman must allege more than PAAR's conduct in the overall operation of the PAAR MLS in which other parties selected and uploaded Boatman's photos. Boatman would have to allege, for example, that PAAR was somehow involved in the selection of the Boatman photos that allegedly were distributed in violation of Boatman's copyrights. *See VHT, Inc.*, 918 F.3d at 732. Boatman does not do so.

Here, Boatman does not allege that PAAR exercised any control over the selection of any Boatman photographs distributed to or displayed by by Realtor.com. As Boatman concedes in his FAC, the PAAR MLS is populated with photographs that real estate agents selected and upload to the MLS, and thus Boatman admits the photographs are <u>not</u> selected by PAAR. The only action Boatman alleges PAAR took was entering into the RIN Agreement in 1996 and then acting as an operator of the MLS that automatically fed photographs to the Realtor.com website. (FAC ¶ 42.)

Thus, Boatman does not sufficiently allege a direct infringement claim against PAAR. The FAC alleges that PAAR did nothing more than operate a largely automated, user-controlled MLS. There can no direct copyright infringement when PAAR was simply acting as a passive resource through which photographs were uploaded onto a third-party's website.

III.  **Move, Inc. has no rights under the RIN Agreement, and the RIN Agreement did not purport to grant RIN any rights in the MLS data other than rights to advertise the listed properties for sale.**

Move, Inc. is not a party to the 1996 RIN Agreement. The RIN Agreement specifically prohibited assignment of any rights without PAAR's prior written consent, and no assignment or consent is alleged by Boatman in the FAC. Boatman accordingly fails to allege sufficient facts to show that Move, Inc. is a successor to RIN's rights under the RIN Agreement. Conclusory allegations provided in the FAC fail to meet the rigorous federal court requirements for a well-pleaded complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

Even if Boatman sufficiently alleged that Move, Inc. has some interest in the RIN Agreement, the claim against PAAR is barred by the language of the RIN Agreement itself. Boatman's claim is entirely dependent upon his conclusory allegation that the RIN Agreement grants Move, Inc. rights to use photos in the PAAR MLS for purposes other than advertising the sale of properties listed for sale in the PAAR MLS. Contrary to this conclusory allegation, however, the RIN Agreement clearly and unambiguously provides that the purpose of the agreement is to advertise the PAAR MLS properties for sale. On its face, the RIN Agreement does not purport to give RIN (much less Move, Inc.) any right to re-display any photographs obtained from the PAAR MLS for purposes other than advertising the properties for sale. Thus, the actual terms of the RIN Agreement, which control over Boatman's conclusory allegations to the contrary, require that Boatman's claims against PAAR be dismissed for failure to state a claim.

Boatman also incorrectly alleges that the RIN Agreement did not provide for the IDX feeds to Realtor.com to be refreshed. Boatman's theory is that the PAAR MLS Rules and Regulations required PAAR's members to periodically refresh their IDX data feeds, thereby removing data for properties that are sold or delisted. Boatman alleges that the RIN Agreement failed to require RIN

16

to refresh its IDX data feeds. In other words, Boatman contends that PAAR somehow infringed on his copyrights by failing to ensure back in 1996 that the RIN Agreement required RIN to periodically refresh its IDX feeds so that properties that were sold or delisted were identified and removed from the properties displayed on the Realtor.com website. Notably, however, Boatman does not allege anywhere that his copyrights are being infringed and that his photos are being displayed on Realtor.com after the sale or delisting of a property as a consequence of this alleged oversight. On the contrary, Boatman removed from his FAC any allegation that any of his photos are being displayed on the Realtor.com website in violation of his copyrights. Further, Boatman's conclusory allegation again misrepresents the actual terms of the RIN Agreement. Boatman claims that the Agreement did not "require the owner or operator of the Realtor.com website to refresh all MLS downloads and IDX displays automatically fed by those downloads over any time frames." (FAC ¶ 74.) Contrary to this statement, the Agreement provides that Data Provider was to "provide updates of the Licensed Data to RIN in an electronic format acceptable to RIN no less frequently than weekly for inclusion on the RPA." (Ex. B, ¶ 7(b).)

In considering a motion to dismiss under Rule 12(b)(6), district courts are free to consider any facts set forth in the complaint that undermine the plaintiff's claim, including exhibits attached to the complaint or documents referenced in the pleading if they are central to the claim. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (citations omitted). "When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Id*. Thus, in the present case, the actual terms of the RIN Agreement control over Boatman's contrary conclusory allegations in the FAC, and dictate that Boatman's claims against PAAR be dismissed for failure to state a claim.

## IV.   Move, Inc. is a necessary party to this action, and Boatman must name Move, Inc. as a defendant or the Court should dismiss Boatman's FAC.

17

Under Rule 19, a necessary party includes any person who "claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may ... as a practical matter impair or impede the person's ability to protect that interest...." Fed. R. Civ. P. 19(a). Move, Inc. satisfies these criteria. In an action to construe or enforce a contract, a missing contracting party is often viewed to be the paradigm of an indispensable party. A judicial declaration as to the validity and the enforceability and construction of a contract necessarily affects, as a practical matter, the interests of both parties to the contract. *U.S. ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 479 (7th Cir. 1996). Further, when ruling on a dismissal for lack of joinder or an indispensable party, a court may go outside the pleadings and look to extrinsic evidence. *Davis Companies v. Emerald Casino, Inc.*, 268 F.3d 477, 481 (7th Cir. 2001). Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Fed. R. Civ. Pro. 12(b)(6); *Ochs v. Hamilton*, 984 F. Supp. 2d 903, 907 (N.D. Ill. 2013).

Boatman's claim against PAAR in this lawsuit is rooted in an alleged contractual relationship between PAAR and Move, Inc., and in turn, Move, Inc.'s purported rights under the contract to re-display the photographs on the Realtor.com website in a manner that infringes on Boatman's copyrights. The adjudication of Boatman's claims in this action requires this Court to find that: (1) Move, Inc. is a successor or otherwise has standing to assert rights under the 1996 RIN Agreement between PAAR and RIN, and (2) that the 1996 RIN Agreement actually grants rights to Move, Inc. to continue to use photographs obtained from PAAR's feed to the Realtor.com website after the sale of the subject properties and/or termination of the listings. Either of these determinations would impact Move, Inc.'s interests in the subject matter of this action. Yet Boatman did not name Move, Inc. as a defendant.

18

As the purported successor in interest to the 1996 contract at issue here, Move, Inc. has a commercial stake in the outcome of this litigation. It therefore would appear beyond dispute that Move, Inc. is a necessary party under Rule 19(a). Furthermore, PAAR's interests and Move, Inc.'s are not identical and do not align, and PAAR could not and would not adequately represent Move, Inc.'s interest. *See Lufkin v. Ill. Dept. of Employment Sec.*, 1997 159546, at *2 (N.D. Ill. March 28, 1997) (unreported in F.Supp.); *but cf. N. Shore Gas Co.*, 896 F. Supp. at 790 (an identity of interests between a named defendant and a third party does not favor adding the third party as a necessary one).

The Court need not reach the question of whether a party is indispensable under Rule 19(b) if joinder of that party would not destroy federal jurisdiction. *Promatek Indus., Ltd. v. Equitrac Corp.*, 185 F.R.D. 520, 523 (N.D. Ill. 1999). Because Boatman's copyright claim arises under federal law, the court's jurisdiction does not depend on the diversity of the parties, and therefore, the Court need only analyze joinder under Rule 19(a). Move, Inc. is a necessary party and must be added as an additional defendant as in this action, but if it is not feasible, then Boatman's FAC must be dismissed.

**V.   Boatman's claim is barred by *res judicata* because there was a final decision on the facts, transactions, and those in privity with the litigants that are at issue in this case. Also, Boatman has and continues to engage in improper claim splitting by naming the parties to these events in separate successive actions.**

The doctrine of claim preclusion or *res judicata* precludes parties from relitigating issues that were or could have been raised in a previous action. *Johnson v. Cypress Hill*, 641 F.3d 867, 874 (7th Cir. 2011). Claim preclusion under federal law has three elements: (1) a final decision in the first suit; (2) a dispute arising from the same transaction (identified by its operative facts); and the same litigants (directly or through privity of interest). *US ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 851 (7th Cir. 2009). *Res judicata* bars not only those issues which were decided in

a prior suit, but also all issues that could have been raised in that action. *Highway J Citizens Group v. U.S. Dept. of Transp.*, 456 F.3d 734, 741 (7th Cir. 2006) (citations omitted). Once a transaction has caused injury, all claims arising from that transaction must be brought in one suit or lost. *Roboserve*, 121 F. 3d 1027, 1035 (7th Cir. 1997). The doctrine of *res judicata* may properly be raised as a basis to dismiss a complaint pursuant to Rule 12(b)(6). *Anderson v. Guaranteed Rate, Inc.*, 2013 WL 2319138, at *3 (N.D. Ill. May 28, 2013).

In *Bell v. Taylor*, the Seventh Circuit found that there was an identity of the causes of action in two copyright infringement cases of the holder of a copyright for photographs depicting a city skyline, as required for *res judicata* to bar the second action. 827 F.3d 699, 706-07 (7th Cir. 2016). The court found that the plaintiff's two lawsuits arose out of a common core of operative facts, even though the plaintiff mistakenly had referenced the wrong photograph is his first action. *Id.*

Boatman has been litigating his copyright claims with respect to the photographs at issue in this action since at least August 2016 when he filed the *Honig* Action. Honig is a real estate sales agency located in Joliet, Illinois that commissioned Boatman to photograph certain homes for sale in 2015. (*Honig* Action at Dkt. #45, ¶¶ 3, 6.) Boatman alleged that the Honig agents distributed Boatman's photos through PAAR for publication on Realtor.com. (*Id.* at Dkt. #45, ¶ 39.) Some of the photos in the *Honig* Action are part of the 1,216 photos at issue in this case. Despite his knowledge throughout the *Honig* Action of PAAR's role in feeding Boatman's photographs to Realtor.com, Boatman did not name PAAR as a defendant in the *Honig* Action. Boatman elected instead to settle the *Honig* Action, and that action was dismissed with prejudice on November 7, 2018. Moreover, Boatman did so after the district court in the *Honig* Action already had ruled as a matter of law that that the licenses Boatman granted to his Peoria area real

estate agent clients permitted the copyrighted photographs to be uploaded to the Realtor.com website.

PAAR was in privity with Honig with respect to the matters at issue in the *Honig* Action. Boatman alleged that the photos at issue in the *Honig* Action were uploaded to Realtor.com using the PAAR MLS pursuant to an agreement between Honig and PAAR that required Honig to follow the "PAAR MLS Rules and Regulations." (Ex. B at ¶39.) Thus, Boatman's claim against PAAR arising out of the same operative facts therefore is barred by *res judicata*. The district court in the *Honig* Action already found that uploading Boatman's photos to Realtor.com was permitted under the licenses Boatman granted his Peoria area real estate agent clients. Boatman settled and dismissed his claims in the *Honig* Action without appealing that ruling. Boatman is not permitted to continue seeking repeated pay-days for the same infringing conduct in successive actions against the various different parties involved in that common operative conduct.

This action also cannot proceed because Boatman has engaged in improper claim-splitting. The doctrine prohibits a party from maintaining a suit that arises from the transaction or events underlying a previous suit simply by changing his legal theory. *Anderson*, 2013 WL 2319138, at *4. The federal definition of a cause of action, when combined with the rule against claim splitting, requires that a plaintiff allege in one proceeding all claims for relief arising out of a single core of operative facts, or be precluded from pursuing those claims in the future. *Shaver v. F.W. Woolworth Co.*, 840 F.2d 1361, 1365 (7th Cir. 1988). Claim splitting is a litigation tactic that the *res judicata* doctrine is meant to prevent. *Palka v. City of Chi.*, 662 F.3d 428, 437 (7th Cir. 2011).

Courts take a pragmatic approach when determining whether a set of facts constitutes a series of connected transactions and consider the relation of the facts in time, space, origin, and motivation. *Huon v. Johnson & Bell, Ltd.*, 757 F.3d 556, 558 (7th Cir. 2014) (citation omitted).

They look to whether the facts form a convenient trial unit that conforms to the parties' expectations or business usage. *Id.* The fact that some events occurred at different times did not matter when the facts in the two complaints described a series of connected transactions that formed a convenient trial unit. *Id.* at 559.

Boatman is seeking to recover for the same alleged infringement from multiple parties in multiple actions under multiple theories. The doctrine of claim splitting prevents Boatman from testing out new legal theories against multiple parties in separate actions. With his latest suit against PAAR, Boatman seeks to relitigate the same events and claims that already were decided or could have been litigated in his prior *Honig* Action, which involved the same operative facts. If Boatman had a good faith basis for suing PAAR for copyright infringement, he should have brought those claims in the *Honig* Action. Because he failed to bring the instant claim in the *Honig* Action, Boatman is barred from seeking relief against PAAR in the present action, and this Court should dismiss Boatman's claims against PAAR with prejudice.

## CONCLUSION

PAAR respectfully requests that this Court address the *res judicata* and claim splitting arguments first. Boatman's claim should be barred and dismissed with prejudice. His claim should be barred because he knew of PAAR and its alleged role in the redisplay of Boatman's photographs since at least 2016, yet never named it as a defendant in the *Honig* Action. He is not permitted to do so now because the doctrines of *res judicata* and claim splitting bar the claims. Should the claims not be barred and dismissed with prejudice on those grounds, the Court should dismiss the FAC for failure to state a claim. PAAR operates an automated MLS website, and Boatman does not allege that PAAR engaged in any volitional conduct directed to his copyrighted photographs. Moreover, the actual terms of the RIN Agreement should be found to bar Boatman's claims against

PAAR as a matter of law. Nor should Boatman be allowed to proceed with his claims against PAAR without naming Move, Inc. as a necessary party. Under Rule 19, Move, Inc. must be named as a party or the case dismissed.

Dated: October 13, 2020                    Respectfully submitted,

                                          Peoria Area Association of Realtors,
                                          Defendant,

                                          By: /s/ Thomas G. Griffin
                                                One of Its Attorneys

Thomas G. Griffin (#6202401)
Matthew C. Casey (#6299254)
Walker Wilcox Matousek LLP
One N. Franklin Street, Suite 3200
Chicago, IL 60606
(312) 244-6700
(312) 244-6800 (fax)
tgriffin@wwmlawyers.com
mcasey@wwmlawyers.com

**Attorneys for Peoria Area Association of Realtors**

**EXHIBIT A**

# RIN

REALTORS Information Network™

700 11TH STREET, N.W.
WASHINGTON, DC 20001

## Agreement

THIS Agreement (the "Agreement") is made and entered into as of the __3__ day of __June__. 1996 by and between REALTORS Information Network, an Illinois corporation ("RIN"), and __Peoria Area Association of Realtors__("Data Provider").

WHEREAS, RIN, through its authorized subcontractor is establishing a world wide web site to advertise certain properties offered for sale by various REALTORS®.

WHEREAS, Data Provider desires to license the Licensed Data (as hereafter defined) to RIN for use in connection with the RPA (as hereafter defined).

NOW THEREFORE, in consideration of the promises and mutual agreements contained herein, the parties hereto agree as follows:

1.   Definitions.  As used in this Agreement, the following terms shall have the meanings set forth herein, and shall be equally applicable to the singular and plural forms.  Any agreement referred to herein shall mean such agreement as amended, supplemented and modified from time to time to the extent permitted by the applicable provisions thereof.

"Confidential Information" shall mean any information relating to or disclosed in the course of the Agreement, which is or should be reasonably understood to be confidential or proprietary to the disclosing party, including, technical processes, formulas, source codes, product designs, sales, cost and other unpublished financial information, product and business plans, projections, and marketing data.  "Confidential Information" shall not include information:  (a) already lawfully known to or independently developed by the receiving party; (b) disclosed in published materials; (c) generally known to the public; (d) lawfully obtained from any third party; or (e) required or reasonably advised to be disclosed by law.

"Internet" shall mean the worldwide network of computers commonly referred to as the Internet.

"WWW" shall mean the specific part of the Internet commonly referred to as the world wide web.

"RPA" shall mean that site on the WWW located at http://www.realtor.com and any other derivative site on the Internet to support property advertising that is owned, operated, or authorized to be operated by RIN, its affiliates or its authorized subcontractors throughout the world through which RIN elects to offer Licensed Data.

"Intellectual Property" shall mean any patent, trademark, service mark, trade dress, logo, trade name, copyright, mask work, trade secret, confidential information, publicity and privacy rights or other property right.

"Foreign HomePages" shall mean any HomePage developed by a source other than RIN.

"Licensed Data" shall mean textual data and information related to a Property as well as optional photographic or digital images, as available, of the same that are included in Data Provider's database, excluding street addresses, private telephone numbers, security codes, owner names or private comment fields that relate to a Property.  "Licensed Data" shall also include any updates provided by Data Provider to RIN or its authorized subcontractors pursuant to this Agreement.

"Property" shall mean residential property:  house, condominium, townhouse or mobile home, offered for sale through a REALTOR® and for which Data Provider maintains listing information relating to the same.  Note: other forms of property may be added upon mutual consent of Data Provider and RIN.

2.   Duties and Rights of Data Provider.  Data Provider shall in accordance with the time frames set forth on Appendix A (as applicable):

a.   provide Licensed Data to RIN in an electronic format acceptable to RIN for inclusion on the RPA;

b.   provide updates of the Licensed Data to RIN in an electronic format acceptable to RIN no less frequently than weekly for inclusion on the RPA;  (Note:  more frequent updates are possible by mutual consent of RIN/Data Provider):

c.   identify the Properties to be excluded in the Licensed Data on RPA;

d.   be responsible for training its staff regarding the use of RPA and the provision of Licensed Data to RIN or its authorized subcontractors;

e.   use reasonable efforts to promote and market the availability and use of the RPA, including promotional vehicles such as using sign-on messages of Data Provider's local listing services, advertising in Data Provider's multiple listing service books, magazines and newsletters, etc.;

f.   encourage brokers and agents to display company information and agent expertise regarding their places of business and services through linkage to RPA, by RIN generated or Foreign HomePages;

g.   encourage vendors to implement DxM by support of NAR guidelines;

h.   commit to use RIN's data exchange methodology ("DxM") as the preferred data transmission format in connection with the RPA and develop a workable plan within six (6) months from the date first set forth above to implement DxM, or obtain a DxM waiver from RIN, it being understood that in lieu of DxM or signed waiver RIN may elect to charge Data Provider a monthly maintenance fee.  Should RIN elect to assess this monthly maintenance fee, Data Provider may terminate this Agreement effective upon sixty (60) days written notice:

i.   promptly inform RIN of any information related to the Licensed Data that could reasonably lead to a claim, demand, or liability of or against RIN and/or its affiliates or authorized subcontractors by any third party;

j.   during the Initial Term and any Renewal Term, provide Licensed Data to RIN or its authorized subcontractors for at least sixty five percent (65%) of the Properties of Data Provider; and

k.   Participate with RIN in locally identified and sold revenue sharing opportunities, or elect to pursue locally identified and sold revenue sharing opportunities on their own.

3.   Duties and Rights of RIN.  RIN, or its authorized subcontractors shall:

a.   provide all necessary computer, telecommunications, software and other equipment and technology or resources to store Licensed Data and to implement, support and host the RPA so that the same will function as an operational WWW site on the Internet;

b.   provide documentation of guidelines as referenced in Section 2a;

c.   provide reasonable assistance to Data Provider as reasonably requested by the same relating to the RPA;

d.   have operational, technical, managerial and day-to-day control over the operation of the RPA;

e.   provided that Data Provider meets its obligations set forth herein, implement the RPA as it related to Properties of the Data Provider on the time frame set forth on Appendix A;

f.   use reasonable efforts to promote the RPA through local newspapers and a national public relations campaign;

g.   provide Data Provider with advertising copy for its use in connection with local consumer awareness campaigns;

h.   register one or more home pages relating to the RPA with commercially available internet indexes and directories to facilitate the ability of third parties to locate and access the RPA;

i.   enhance the RPA in its sole discretion; and

j.   use reasonable efforts to obtain from on-line computer service providers a limited number of diskettes for access to such on line computer service that will contain a limited number of free hours of access to the Internet, and provide the same to Data Provider so that Data Provider may provide the same to its members for distribution to consumers, it being understood that RIN's efforts may not be successful.

4.   <u>License Grant</u>. During the term of this Agreement, Data Provider hereby grants to RIN, its affiliates and authorized subcontractors a worldwide license to market, license, display, perform and promote the Licensed Data solely through the RPA. It is understood that all national account revenue derived from advertising through corporate national sponsorships whether the ads are displayed nationally or locally, shall be RIN's. RIN may also participate in the development and revenue sharing of locally identified and sold customers if so requested by the Data Provider. Subject to the foregoing license, as between RIN, its affiliates and authorized subcontractors and Data Provider, <u>Data Provider shall retain all right, title, and interest in the Licensed Data</u>.

5.   <u>Fees</u>. In consideration of RIN operating and maintaining the RPA, Data Provider shall pay to RIN the fees as set forth in <u>Appendix A</u>. Data Provider shall not levy any fees to the membership associated with this RIN offer except for direct cost recovery.

6.   <u>Audit Rights</u>. RIN reserves the right to periodically audit this agreement for compliance.

7.   <u>Confidentiality</u>. Each party acknowledges that Confidential Information may be disclosed to the other party during the course of this Agreement. Each party agrees that it shall take reasonable steps, at least substantially equivalent to the steps it takes to protect its own proprietary information (but in no event less than due care), during the Initial Term, any Renewal Term and for a period of three (3) years following expiration of earlier termination of this Agreement, to prevent the duplication or disclosure of Confidential Information, other than by or to its employees or agents and the employees and agents of their respective affiliates and authorized subcontractors who must have access to the Confidential Information to perform such party's obligations hereunder, who shall each agree [in writing] to comply with this <u>Section 7</u> of this Agreement.

8.   <u>Representations and Warranties</u>.

a.   <u>By RIN</u>. RIN represents and warrants to Data Provider that: (i) RIN has all right, power and authority to enter into and perform its obligations set forth in this Agreement in accordance with its terms; (ii) RIN or its authorized subcontractor shall provide all computer, telecommunications, software and other equipment and technology or resources necessary to implement, support and host the RPA.

b.   <u>By Data Provider</u>. Data Provider represents and warrants to RIN that: (i) Data Provider has all right, power and authority to enter into and perform its obligations set forth in this Agreement in accordance with its terms; (ii) the Licensed Data will not infringe or violate any Intellectual Property of any third party and is not defamatory; (iii) the Licensed Data will not contain any content, materials or services that violate applicable law, regulation or third party right; (iv) Data Provider has all necessary authority and permissions to provide the Licensed Data to RIN and its authorized subcontractors for the purposes contemplated by this Agreement; and (v) the Licensed Data only contains properties that are offered for sale through REALTORS®.

9.   LIMITATION OF LIABILITY; DISCLAIMER; INDEMNIFICATION.

   a.   Liability.  UNDER NO CIRCUMSTANCES SHALL EITHER PARTY (OR THEIR RESPECTIVE
AFFILIATES OR AUTHORIZED SUBCONTRACTORS) BE LIABLE TO ANY OTHER PARTY FOR INDIRECT,
INCIDENTAL, CONSEQUEN-TIAL, PUNITIVE OR SPECIAL DAMAGES (EVEN IF THAT PARTY HAS BEEN
ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING FROM THE USE OR INABILITY TO USE THE
RPA OR ANY OTHER PROVISION OF THIS AGREEMENT, INCLUDING, LOSS OF REVENUE OR ANTICIPATED
PROFITS OR LOST BUSINESS. IN NO EVENT SHALL RIN BE LIABLE TO ANY OTHER PARTY (INCLUDING
DATA PROVIDER) FOR MORE THAN THE AGGREGATE AMOUNTS PAID BY DATA PROVIDER TO RIN
UNDER THIS AGREEMENT.

   b.   No Additional Warranties.  EXCEPT AS SET FORTH IN THIS AGREEMENT, NEITHER PARTY
MAKES ANY, AND EACH PARTY HEREBY SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS OR
WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE RPA OR THE LICENSED DATA, INCLUDING ANY
IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED
WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE. WITHOUT LIMITING
THE GENERALITY OF THE FOREGOING, RIN SPECIFICALLY DISCLAIMS ANY WARRANTY REGARDING
THE NUMBER OF "HITS," CONSUMER TRAFFIC OR LEADS THAT WILL BE GENERATED BY THE RPA, THAT
THE RPA WILL BE AVAILABLE, UNINTERRUPTED OR ERROR FREE, THAT THE DATA RELATING TO EACH
PROPERTY WILL BE FREE OF ERRORS OR OMISSIONS OR NONINFRINGEMENT.

   c.   Indemnity.  Data Provider shall indemnify, defend and hold harmless RIN, its officers, directors, agents,
affiliates, subcontractors, and employees from any and all third party claims, demands, liabilities, costs or expenses,
including reasonable attorneys fees ("Liabilities") resulting from the indemnifying party's material breach of any
obligation, representation or warranty set forth in this Agreement, except where Liabilities result from the gross negligence
or knowing and willful misconduct of the other party.

   d.   Claims.  RIN shall (i) promptly notify Data Provider in writing of any indemnifiable claim and give Data
Provider the opportunity to defend or negotiate a settlement of any such claim at Data Provider's expense, and (ii)
cooperate fully with Data Provider, at Data Provider's expense, in defending or settling any such claim.. RIN reserves the
right, at its own expense, to assume the exclusive defense and control of any matter otherwise subject to indemnification by
Data Provider hereunder, and in such event, Data Provider shall have no further obligation to provide indemnification for
such matter hereunder.

   10.  Term.  The initial term of this Agreement shall be for an initial period of thirty six (36) months from the date
first written above ("Initial Terms").  This Agreement shall be automatically extended for periods of twelve (12) months
(each a "Renewal Term") unless the Agreement has been terminated as set forth herein, or unless either party notifies the
other in writing of its election to have this Agreement expire at least sixty (60) days in advance of the end of such Initial
Term or any such Renewal Term.  In addition, RIN reserves the right to revisit this Agreement within six (6) months of
inception to determine the success of the Data Provider with the promotion and acceptance of RIN provided Broker/Agent
HomePages or linkage of foreign HomePages (Appendix A, Section 2f).  If a revenue "stream" equivalent to a $1.00 per
month per listing is not achieved, RIN may, at its discretion, assess a monthly maintenance fee. If RIN makes that
assessment, then the Data Provider has the right to terminate this agreement, effective upon sixty (60) days written notice.

   11.  Termination.  Either Party may terminate this Agreement at any time in the event of a material breach by the
other party which remains uncured after thirty (30) days written notice thereof and as otherwise set forth in this Agreement.

   12.  Consequences of Termination or Expiration.  Upon the termination or expiration of this Agreement for any
reason: (a) the license granted pursuant to Section 4 shall terminate; (b) RIN shall promptly remove all Licensed Data of
the Data Provider from the RPA, and at the sole option of RIN, destroy or return the same to Data Provider; and (c) each
party shall promptly prepare an accounting of all sums (if any) due to each other, and each party shall pay the same within
fifteen (15) days of receipt of an invoice therefor.

   13.  Applicable Law; Venue.  This Agreement has been entered into in the State of Illinois, and all matters or
issues relating in any way thereto shall be governed by the laws of the State of Illinois applicable to contracts entered into
and performed entirely within the State. Each party irrevocably consents to the exclusive jurisdiction of the state and

federal courts located in Cook County, Illinois. in connection with any action to enforce the provisions of this Agreement. to recover damages or other relief for breach or default of this Agreement, or otherwise arising under or by reason of this Agreement.

14.  Assignment.  Neither this Agreement nor any right or obligation arising hereunder may be assigned (voluntarily, by operation of law or otherwise). in whole or in part, by either party without the prior written consent of the other party: provided that, without the consent of, but upon prior written notice to. Data Provider, RIN may assign some or all of its rights and obligations (a) to an affiliate of RIN or (b) InfoTouch Corporation.

15.  Successors and Assigns.  Subject to Section 14, this Agreement shall be binding upon. and inure to the benefit of, the parties and their respective successors and permitted assigns.

16.  Complete Agreement.  This Agreement and its attachments set forth the entire agreement between the parties with respect to the subject matter hereof, and supersede all prior or contemporaneous understandings, communications or agreements. whether written or oral, regarding such subject matter.

17.  Amendment.  This Agreement and its attachments may not be amended or modified in any manner, except by a written instrument signed by the parties.

18.  Notice.  All notices, consents and approvals given under this Agreement shall be in writing and shall be delivered in person, by first class or express mail or facsimile addressed as follows:

If to Data Provider:                                    If to RIN:

Peoria Area Assoc. of Realtors          REALTORS Information Network
110 E McClure                                   430 N. Michigan Avenue
Peoria IL  61603                              Chicago, Illinois 60611-4087
Attn:  Dallas Hancock                       Attn:  Senior Vice President, Sales
Telephone: 309-688-8591               Telephone: 312/329-8530
Facsimile: 309-688-3120               Facsimile: 312/329-8539

Either party may change its address or addressee for the purposes of this Paragraph by notice. Notice given in accordance with this section shall be deemed given when received.

19.  Waiver.  No waiver by either party of any breach or default by any other shall be deemed a waiver of any other breach or default.

20.  Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby are not affected in any manner materially adverse to either party.  Upon such determination that any term or other provisions is invalid, illegal or incapable of being enforced, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions be consummated as originally contemplated to the fullest extent possible.

21.  Interpretation of Agreement.  When a reference is made in this Agreement to an article or section, such reference shall be to an article or section of this Agreement unless otherwise indicated.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes," or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

22.  Survival.  The provisions of Sections 7, 8, 9, 12, 13, 20 and 22 shall survive any expiration or termination of this Agreement for any reason

23.  Relation of Parties.  Each parties' relationship to every other party is that of an independent contractor.  The parties are not partners or joint venturers with one another, and do not intend to form a partnership or joint venture.

Page 8

24. **Force Majeure.** Neither party hereto shall be deemed to be in default of any provision of this Agreement or for failure in performance, resulting from acts or events beyond the reasonable control of such party and arising without its fault or negligence, provided that prompt written notice of any such act or event is given to the other party. Such acts shall include, but not be limited to, acts of God, civil or military authority, interruption of electric or telecommunication services, civil disturbances, war, strikes, fires, floods or other catastrophes. If for any of the reasons set forth above either party shall be unable to perform any obligation when due, such party shall immediately notify the other party of such inability and of the period over which such inability is expected to continue. Affected obligations of the parties shall be temporarily suspended during the period of force majeure and the time for performance under this Agreement shall, as applicable, be extended by the duration of any such period; provided, however, that if the delay continues for a period of sixty (60) calendar days or more, the party receiving notification of the inability may terminate this Agreement by written notice to the other party.

25. **Duly Authorized signatories.** Each party represents and warrants that its signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary corporate or other appropriate action to execute this Agreement.

26. **Counterparts.** This Agreement may be executed in any number of counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by both parties and delivered to the other party.

27. **Further Cooperation.** Each party hereto agrees to cooperate with the other, at a party's request and at such party's expense, to execute any and all documents or instruments, or to obtain any consents, in order to assign, transfer, perfect, record, maintain, enforce or otherwise carry out the intent of the terms of this Agreement.

AGREED AND ENTERED INTO in Chicago, Illinois as of the date first written above.

REALTORS Information Network

By: _____

Title: _____ Sn. V.P. _____


Peoria Area Assoc.

By: _____

Title: _____ EVP _____

Page 6

## APPENDIX A

1.   <u>Initial Fees</u>.   RIN contemplates that the vast majority of implementations will result in no initial fees. However, due to the diversity of Data Provider systems, RIN may require the payment of initial fees as a result of technological barriers that RIN discovers that will require RIN to expend significant resources. RIN will notify Data Provider in writing of such fees (if any), in which case Data Provider may, at its option, terminate this Agreement upon written notice to RIN within ten (10) days following such notification.

2.   <u>Basic RPA Listing</u>.   The "Basic RPA Listing" at the option of Data Provider, may contain the following for each Property:

    a.   text describing the Property, it being understood that such text may not include street addresses, private telephone numbers, security codes, owner names or private comment fields commonly occurring in Data Provider data; a photograph or image of the Property; and

    b.   the name, telephone number, and e-mail address for the Property's listing broker.

3.   <u>Fees for Basic RPA Listings</u>.

    a.   Provided that this Agreement is executed by Data Provider by April 7, 1996, RIN shall provide the Basic RPA Listings to Data Provider without charge, it being understood that RIN reserves the right to revisit this Agreement within six (6) months of Agreement execution to determine the success of the Data Provider with the promotion and acceptance of RIN provided Broker/Agent HomePages or linkage of foreign HomePages (<u>Section 2f</u>). If a revenue stream equivalent to a $1 per month per listing is not achieved, RIN may, at its discretion, assess a monthly maintenance fee. If RIN makes that assessment, then the Data Provider has the right to terminate this Agreement effective upon sixty (60) days written notice.

4.   <u>Time and Method of Payment by Data Provider</u>.

    a.   RIN shall invoice Data Provider monthly for all fees and other charges payable by Data Provider hereunder. Such fees and charges shall be payable to Data Provider within thirty (30) days of the date of invoice. Any fees not paid within terms are subject to late fees equal to one percent (1%) per month or the highest rate permitted by law. Fees remaining unpaid within sixty (60) days of due date constitute material breach of this Agreement pursuant to <u>Section 11</u>.

    b.   All of RIN's fees and other charges are exclusive of any taxes or levies, including, value added tax, and if any such taxes or levies are payable in respect to any of RIN's fees or charges, such taxes or levies shall be added to the applicable fees and prices. Data Provider agrees to bear all taxes, duties, levies, and other similar charges (and any related interest and penalties), however designated, imposed as a result of the existence or operation of this Agreement, including but not limited to any tax which Data Provider is required to withhold or deduct from payments to RIN, except any net income tax imposed upon RIN by the United States or any governmental entity within the United States.

**EXHIBIT D**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MICHAEL BOATMAN, an individual, | |
| Plaintiff, | Civil Action No. 16-cv-8397 |
| v. | Judge John J. Tharp, Jr. |
| | Magistrate Judge Maria Valdez |
| HONIG REALTY, INC. d/b/a COLDWELL BANKER HONIG-BELL, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## <u>SECOND AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT</u>

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, Plaintiff, Michael Boatman ("Plaintiff"), by and through his undersigned attorneys, for his second amended complaint against Defendant, Honig Realty, Inc. d/b/a Coldwell Banker Honig-Bell ("Honig-Bell"), states as follows:

## <u>NATURE OF THE ACTION</u>

1.      This is an action arising under the copyright laws of the United States, 17 U.S.C. § 101 *et seq.*, and is brought by Plaintiff against Defendant Honig-Bell for Honig-Bell's infringement of 356 registered copyrighted photographs owned by Plaintiff in violation of 17 U.S.C. § 501 *et seq.*, and for Honig-Bell's intentional removal or alteration of "copyright management information" originally contained in such registered copyrighted photographs, as well as 168 additional copyrighted photographs, in violation of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202(b).

**THE PARTIES**

2.      Plaintiff Michael Boatman is an individual who resides at 124 Kaskaskia Ct., East Peoria, Illinois 61611.  Mr. Boatman is a professional photographer.

3.      On information and belief, Defendant Honig-Bell is a corporation organized under the laws of the State of Illinois having a place of business at 320 Waterstone Way, Suite 100, Joliet, Illinois 60431.  On further information and belief, Honig-Bell is in the business of residential and commercial real estate sales and related services.

**JURISDICTION AND VENUE**

4.      This Court has exclusive jurisdiction over the subject matter of this case under 28 U.S.C.  § 1331 because this action arises under the copyright laws of the United States.

5.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (d) and 1400(a) because, as described more fully below, a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.  Further, Defendant Honig-Bell has contacts in this judicial district sufficient to subject it to the personal jurisdiction of this district if this district were a separate state.

**FACTS**

**I.      Plaintiff's Registered Copyrighted Photographs**

6.      From early through mid-2015, Plaintiff took numerous photographs of each of nine real estate properties for agents of Defendant Honig-Bell (the "Photographed Properties").  Plaintiff group-registered each such photograph with the U.S. Register of Copyrights (the "Registered Photographs").  The table on the following page includes the address of each of the Photographed Properties, the date on which Plaintiff photographed each of the Photographed Properties, the number of Registered Photographs Plaintiff took of each of the Photographed Properties, the Certificate of Registration number for each set of Registered Photographs Plaintiff

took of the Photographed Properties, and the effective date of registration for each set of Registered Photographs Plaintiff took of the Photographed Properties. Copies of the Certificate of Registration for each set of Registered Photographs are attached as Exhibit A hereto. Further, a complete list of all the Registered Photographs at issue in this action is attached as Exhibit B hereto.

| Date Created by Plaintiff | Photographed Property Address | Number of Registered Works | Registration Date | Registration # |
|---|---|---|---|---|
| 5/29/15 | 207 Country Club Dr., Pekin, IL | 52 | 6/26/15 | VA0001964540 |
| 3/31/15 | 2219 Knollaire Dr., Washington, IL | 22 | 6/26/15 | VA0001964540 |
| 4/6/15 | 1008 W. Kensington Dr., Peoria, IL | 26 | 6/26/15 | VA0001964540 |
| 3/30/15 | 614 W. Ravinwoods Rd., Peoria, IL | 12 | 6/26/15 | VA0001964540 |
| 7/15/15 | 614 W. Ravinwoods Rd., Peoria, IL | 38 | 7/28/15 | VA0001964052 |
| 4/6/15 | 9712 Cherrybark Ct., Peoria, IL | 60 | 6/26/15 | VA0001964540 |
| 5/11/15 | 218 E. Surrey Lane, East Peoria, IL | 50 | 6/26/15 | VA0001964540 |
| 5/1, 5/4/2015 | 1010 NE Glen Oak Ave., Peoria, IL | 33 | 6/26/15 | VA0001964540 |
| 4/30/15 | 179 State Rte. 116, East Peoria, IL | 32 | 6/26/15 | VA0001964540 |
| 7/15/15 | 1604 School St., Washington, IL | 31 | 7/28/15 | VA0001964052 |

7.     The following is a reproduction of one of the 26 Registered Photographs Plaintiff took of the Photographed Property located at 1008 West Kensington Drive, Peoria, Illinois 61614, on April 6, 2015 (the "Registered Kensington Dining Room Photograph"):



8.   Because Plaintiff registered each of the Registered Photographs within three months of the date he created each such photograph, at his election, Plaintiff will be entitled to an award of statutory damages and/or attorney's fees pursuant to 17 U.S.C. § 412(2) upon a determination that Defendant Honig-Bell is liable for infringement of the Registered Photographs.

## II.   Plaintiff's Grant of a Limited License to the Registered Photographs to Defendant Honig-Bell

9.   In connection with taking each set of Registered Photographs of the Photographed Properties and providing digital copies of the same to Defendant Honig-Bell, Plaintiff granted Defendant Honig-Bell a limited copyright license (the "Limited License"), which Limited License provides:

> Photography for locale [sic] Realestate [sic].  Photography for listing and marketing of [Photographed Property address], a house.  Usage lease expires with the listing agreement termination.  No usage rights are granted until full payment is made. ***Nontransferable to any 3rd party for any reason without prior written consent from the author and copyright owner Mike Boatman.***  Mike Boatman maintains full and complete ownership of images.

(Emphasis added.)

10.   Plaintiff submitted invoices for the Registered Photographs to realtors Trish Yocum and Kendra Sipes, who at all relevant times were employed as real estate agents of Defendant Honig-Bell.  Each such invoice included the Limited License set forth in paragraph 9 above.  Copies of those invoices are attached as Exhibit C hereto.

11.   In addition to invoicing his real estate clients after taking and delivering photographs of real estate properties, it was Plaintiff's custom and practice to send his clients copies of (i) Plaintiff's written "Real estate photography usage fees proposal" (the "Usage Terms") and (ii) the express language of Plaintiff's Limited License before taking and delivering photographs.  Plaintiff's Usage Terms set forth Plaintiff's fee structure and include the following express "Restricted Lease Usage" provision:

- 4 -

**Restricted Lease Usage:**

Photography usage rights are restricted to the marketing of the listed property. Usage lease is nontransferable to 3rd parties. Lease expires upon sale of the house or cancellation of the listing agent or broker.

(Emphasis in original.) Plaintiff provided copies of his Usage Terms and the language of his Limited License to Defendant Honig-Bell's real estate agents, Ms. Yocum and Ms. Sipes, when negotiating his services relative to the Photographed Properties. By way of example and not limitation, on April 17, 2015, Plaintiff emailed Ms. Sipes copies of his Usage Terms and the language of his Limited License. (Exhibit D hereto.) In the body of that email, Plaintiff advised Ms. Sipes that "I'm also attaching my real estate usage agreement which limits the use of the photographs to the listing and marketing of this particular property so long as you have the listing contract. Once your listing contract expires or the house is sold the images can no longer be used."

(*Id.*)

### III. Plaintiff's Inclusion of Copyright Management Information Within the Registered Photographs

12. As delivered to Defendant Honig-Bell, Plaintiff included the following embedded "copyright management information" as that term is defined under 17 U.S.C. § 1202(c):

| Artist: | **Mike Boatman** |
| | (Plaintiff's personal information redacted.) |
| Copyright: | © Mike Boatman 2015 |
| Terms of Use: | Restricced |

### IV. Defendant Honig-Bell's Unauthorized Transfer of the Registered Photographs to Third-Party Zillow, Inc.

13. Without seeking the written consent of Plaintiff, Defendant Honig-Bell distributed the Registered Photographs to third-party Zillow, Inc. ("Zillow") in order to advertise the Photographed Properties for sale. By way of example and not limitation, the Registered

Kensington Dining Room Photograph, and the other Registered Photographs Plaintiff took of the Kensington Photographed Property on April 6, 2015, are currently displayed on Zillow.com as shown in part below:



(*See, e.g.,* http://www.zillow.com/homes/for_sale/5120691_zpid/40.762156,-89.605294,40.759 194,-89.610551_rect/17_zm/1_fr/?view=map (callout of the Registered Kensington Dining Room Photograph added for clarity).)

14.     On September 5, 2017, this Court granted-in-part Defendant Honig-Bell's motion to dismiss Plaintiff's initial complaint in this action.  (Order on Motion to Dismiss, Dkt. #33.)  In dismissing Plaintiff's claim for direct infringement of his copyrights, the Court ruled that Defendant Honig-Bell's distribution and transfer of the Registered Photographs to third parties Zillow and Realtor.com was "for the stated purposes of listing and marketing the [Photographed Properties]" and, therefore, fell "within the scope of [the Limited License]."  (*Id.* at 5.)  Without waiver of any arguments Plaintiff may raise on appeal concerning the Court's dismissal of Plaintiff's originally-pled direct copyright infringement claim, as discussed more fully in the paragraphs below, for the purpose of this Second Amended Complaint, Plaintiff does *not* allege that Defendant Honig-Bell's mere act of distributing, transferring, and uploading the Registered

Photographs to third parties such as Zillow and Realtor.com, without more, constituted direct copyright infringement.

15.     In direct contravention of the express terms of the Limited License, and by way of example and not limitation, the Registered Kensington Dining Room Photograph, and the other Registered Photographs of the Kensington Photographed Property Defendant Honig-Bell distributed to third-party Zillow, have remained published on Zillow.com long after the June 10, 2015 sale date of the Kensington Photographed Property (as indicated on the Zillow.com web page shown in paragraph 13 above).  On information and belief, such publication has continued despite the termination of Defendant Honig-Bell's listing agreement with respect to the Kensington Photographed Property.  Like those of the Kensington Photographed Property, numerous other of the Registered Photographs remain improperly published on Zillow.com despite the sale of the subject Photographed Property.  As discussed more fully in the paragraphs below, the improper publication of the Registered Photographs of the Kensington Photographed Property and numerous other of the Registered Photographs after the termination of Defendant Honig-Bell's listing agreements for the underlying properties, and for other purposes unrelated to "the stated purposes of listing and marketing the [properties]" (Order on Motion to Dismiss at 5, Dkt. #33), was the direct result of acts Defendant Honig-Bell committed in addition to merely distributing, transferring, and uploading the Registered Photographs to third parties such as Zillow and Realtor.com.

16.     On July 23, 2015, in separate conversations, Plaintiff spoke by telephone with two employees of Defendant Honig-Bell who were present at, or work out of, Defendant Honig Bell's headquarters at 320 Waterstone Way, Suite 100, Joliet, Illinois 60431, or were otherwise located in this judicial district.  In the first such discussion, Defendant Honig-Bell's employee, Ms. Kim

Jesen, who Plaintiff called at phone number (815) 553-2400, and who Plaintiff understood to have been associated with Defendant Honig-Bell's marketing department, advised Plaintiff that Defendant Honig-Bell's IT department had created and maintained an online "portal" that Defendant Honig-Bell uses to upload photographs for publication on Zillow. In the second such discussion, Defendant Honig-Bell's employee, Mr. Dennis Dunn, who Plaintiff called at (773) 484-6311 and who identified himself as Defendant Honig-Bell's IT director, advised Plaintiff that Defendant Honig-Bell has a contract with Zillow that governs the terms of Defendant Honig-Bell's publication and advertisement of real estate properties (the "Zillow Listing Agreement").

17.    On information and belief, the officers, representatives, employees, or agents of Defendant Honig-Bell responsible for negotiating and executing the Zillow Listing Agreement work out of Defendant Honig-Bell's headquarters at 320 Waterstone Way, Suite 100, Joliet, Illinois 60431, in this judicial district.

18.    On further information and belief, the online "portal" that Defendant Honig-Bell uses to upload photographs for publication on Zillow, including Defendant Honig-Bell's upload of Plaintiff's Registered Photographs, resides, and/or is maintained and serviced, at Defendant Honig-Bell's headquarters at 320 Waterstone Way, Suite 100, Joliet, Illinois 60431, in this judicial district.

19.    On further information and belief, the officers, representatives, employees, or agents of Defendant Honig-Bell responsible for causing, authorizing, or allowing Defendant Honig-Bell's unauthorized and infringing transfer of Plaintiff's Registered Photographs to Zillow work out of Defendant Honig-Bell's headquarters at 320 Waterstone Way, Suite 100, Joliet, Illinois 60431, in this judicial district, and committed acts resulting in infringement of Plaintiff's Registered Photographs in this judicial district.

20.     In order to upload photographs for publication on Zillow, a party must agree to be bound by Zillow's terms of use (the "Zillow Terms of Use"), which Zillow Terms of Use provide:

> For materials you post or otherwise provide to Zillow Group in connection with the Services (your "Submission"), you **grant Zillow Group an irrevocable, perpetual, royalty-free worldwide license to (a) use, copy, distribute, transmit, publicly display, publicly perform, reproduce, edit, modify, prepare derivative works of or incorporate into other works, and translate your Submission, in connection with the Services or in any other media, and (b) sublicense these rights, to the maximum extent permitted by applicable law**. Zillow Group will not pay you for your Submission or to exercise any rights related to your Submission set forth in the preceding sentence. Zillow Group may remove or modify your Submission at any time. **For each Submission, you agree to provide accurate and complete information and represent that you have all rights necessary to grant Zillow Group the rights in this paragraph, that Zillow Group's use of the Submission will not infringe any third party rights and that the Submission complies with Section 2(a) above**. You are solely responsible for all Submissions made through your user account(s) on the Services or that you otherwise make available through the Services.

(Zillow Terms of Use, ¶ 3 (emphasis added); *see also id.* at ¶ 2(a) (agreeing not to use Zillow's services in any way that, *inter alia*, is "unlawful").)  A copy of the Zillow Terms of Use is attached as Exhibit E hereto.

21.     On information and belief, Defendant Honig-Bell agreed to be bound by the Zillow Terms of Use.

22.     The rights Defendant Honig-Bell unlawfully granted to Zillow pursuant to the Zillow Terms of Use exceed the scope of the Limited License, which permitted Defendant Honig-Bell to use the Registered Photographs only for the purposes of listing and marketing the properties, and then, only until the sale of the subject Photographed Properties.  (*See* Limited License, ¶ 9 above; Usage Terms, ¶ 11 above.)

23.     Accordingly, without seeking Plaintiff's written consent, as required by the express terms of the Limited License, Defendant Honig-Bell uploaded the Registered Photographs to Zillow knowing that it unlawfully granted rights in the Registered Photographs to Zillow under

the Zillow Terms of Use that far exceeded the scope of the Limited License – namely, as pertains to Plaintiff's claim for direct infringement of his copyrights and as discussed more fully in the paragraphs below, (i) the right to publish the Registered Photographs even after termination of the listing agreements for the subject properties (which Zillow did), (ii) the right to publish the Registered Photographs for purposes other than the listing and marketing of the subject properties, such as, for example, for use in third party advertising totally unrelated to the listing and marketing of the subject properties (which use Zillow made of Registered Photographs on its "Zillow Digs" advertising pages), and (iii) the unfettered right to an "irrevocable, perpetual, royalty-free worldwide license to (a) use, copy, distribute, transmit, publicly display, publicly perform, reproduce, edit, modify, prepare derivative works of or incorporate into other works, and translate [the Registered Photographs], in connection with the Services or in any other media, and (b) sublicense these rights, to the maximum extent permitted by applicable law." (Ex. E, Zillow Terms of Use, ¶ 3.)

**V.  Defendant Honig-Bell's Unauthorized Transfer of
Registered Photographs to Other Third-Parties**

24.    The following is a reproduction of one of the 52 Registered Photographs Plaintiff took of the Photographed Property located at 207 Country Club Drive, Pekin, Illinois 61554, on May 29, 2015 (the "Registered Country Club Exterior Photograph"):



25.     Without seeking Plaintiff's written consent, Defendant Honig-Bell distributed Registered Photographs, or caused Registered Photographs to be distributed, to third-parties other than Zillow, including, for example, Realtor.com, in order to advertise Photographed Properties for sale as well as for other improper purposes in violation of the Limited License.  By way of example and not limitation, the Registered Country Club Exterior Photograph Plaintiff took of the Country Club Photographed Property on May 29, 2015, is currently displayed on Realtor.com as shown in part on the following page:



(*See, e.g.,* http://www.realtor.com/realestateandhomes-detail/207-Country-Club-Dr_Pekin_IL_61554_M80405-77163.)

26.      As stated in paragraphs 14, 15, and 23 above, Plaintiff does not allege that Defendant Honig-Bell's mere act of distributing, transferring, and uploading the Registered Photographs to third parties such as Zillow and Realtor.com, without more, constituted direct copyright infringement.

27.      In direct contravention of the express terms of the Limited License, and by way of example and not limitation, the Registered Country Club Exterior Photograph has remained published on Realtor.com long after the sale date of the Country Club Photographed Property (as indicated on the Realtor.com web page shown in paragraph 25 above (see "Off Market" notice above property address)).  On information and belief, such publication has continued despite the termination of Defendant Honig-Bell's listing agreement with respect to the Country Club

Photographed Property.  On information and belief, like the Registered Country Club Exterior Photograph, numerous other of the Registered Photographs remain improperly published on third-party websites such as Realtor.com despite the sale of the subject Photographed Property.  As discussed more fully in the paragraphs above and below, the improper publication of the Registered Country Club Exterior Photograph and numerous other of the Registered Photographs after the termination of Defendant Honig-Bell's listing agreements for the underlying properties, and for other purposes unrelated to "the stated purposes of listing and marketing the [properties]" (Order on Motion to Dismiss at 5, Dkt. #33), was the direct result of acts Defendant Honig-Bell committed in addition to merely distributing, transferring, and uploading the Registered Photographs to third parties such as Zillow and Realtor.com.

28.  Indeed, on information and belief, 231 of the Registered Photographs were improperly republished on Realtor.com.  Screenshots of these Registered Photographs are attached as Exhibit F hereto.

29.  On further information and belief, Defendant Honig-Bell is a party to one or more contracts with third-parties such as, for example, Realtor.com, which one or more contracts governs the terms of Defendant Honig-Bell's publication and advertisement of real estate properties on such third-parties' websites ("Third-Party Listing Agreements").

30.  On further information and belief, Defendant Honig-Bell uses an online "portal" – similar to, or the same as, the portal used to upload photographs for publication on Zillow – to upload photographs for publication on third-party websites such as, for example, Realtor.com.

31.  On information and belief, the officers, representatives, employees, or agents of Defendant Honig-Bell responsible for negotiating and executing the Third-Party Listing

- 13 -

Agreements work out of Defendant Honig-Bell's headquarters at 320 Waterstone Way, Suite 100, Joliet, Illinois 60431, in this judicial district.

32. On further information and belief, the online "portal" that Defendant Honig-Bell uses to upload photographs for publication on third-party websites such as, for example, Realtor.com, including Defendant Honig-Bell's upload of Plaintiff's Registered Photographs, resides, and/or is maintained and serviced, at Defendant Honig-Bell's headquarters at 320 Waterstone Way, Suite 100, Joliet, Illinois 60431, in this judicial district.

33. On further information and belief, the officers, representatives, employees, or agents of Defendant Honig-Bell responsible for causing, authorizing, or allowing Defendant Honig-Bell's unauthorized and infringing transfer of Plaintiff's Registered Photographs to third-parties such as, for example, Realtor.com, work out of Defendant Honig-Bell's headquarters at 320 Waterstone Way, Suite 100, Joliet, Illinois 60431, in this judicial district, and committed acts resulting in infringement of Plaintiff's Registered Photographs in this judicial district.

34. In order to upload photographs for publication on third-party websites such as, for example, Realtor.com, a party must agree to accept and comply with the terms, conditions, and notices stated in Move, Inc.'s (which operates Realtor.com) terms of use (the "Move Terms of Use"), which Move Terms of Use provide:

> To the extent that you post, upload, input, submit or otherwise transmit (collectively, "Transmit" or "Transmitting" as appropriate) Content on or through the Move Network, you agree to provide true, accurate and complete information and to refrain from impersonating or falsely representing your affiliation with any person or entity. You are entirely responsible for all Content that you provide or otherwise make available via the Move Network. ***You also warrant and represent that you own or otherwise control all of the rights to such Content including, without limitation, all the rights necessary for you to Transmit such Content, and to transfer your or others' interests in such Content to Move as provided below***.
> ***
> ***By Transmitting Content to the Move Network, you grant, and you represent and warrant that you have the right to grant, to Move an irrevocable, perpetual, non-***

- 14 -

> *exclusive, fully paid, worldwide license to use, copy, perform, display, and distribute the Content and to prepare derivative works of, or incorporate into other works, the Content, and to grant and authorize sublicenses (through multiple tiers) of the foregoing*. Furthermore, by posting Content to any public area of the Move Network, you grant Move all rights necessary to prohibit any subsequent aggregation, display, copying, duplication, reproduction, or exploitation of the Content on the Move Network by any party for any purpose.

(Move Terms of Use, "Content You Provide" (emphasis added); *see also id*. (promising not to use the "Move Network" to transmit any Content "that you do not have a right to post and transmit under any law or under contractual relationships" or "such that such posting, uploading, or transmission constitutes the infringement of any . . . copyright or other proprietary rights of any party")).) A copy of the Move Terms of Use is attached as Exhibit G hereto.

35. The Move Network homepages include, but are not limited to, pages currently located at http://www.move.com/, https://www.realtor.com/, http://newhomes.move.com/, http://www.moving.com/, http://www.relocation.com/, http://www.doorsteps.com/, http://www.topproducer.com/, http://www.tigerlead.com/, http://www.fivestreet.com/, http://www.listhub.com and http://www.homefair.com/. (*See id*.)

36. On information and belief, Defendant Honig-Bell agreed to be bound by the Move Terms of Use.

37. The rights Defendant Honig-Bell unlawfully granted to third-party websites such as Realtor.com pursuant to the Move Terms of Use exceed the Limited License, which permitted Defendant Honig-Bell to use the Registered Photographs only for the purposes of listing and marketing the properties, and then, only until the sale of the subject Photographed Properties. (*See* Limited License, ¶ 9 above; Usage Terms, ¶ 11 above.)

38. Accordingly, without seeking Plaintiff's written consent, as required by the express terms of the Limited License, Defendant Honig-Bell uploaded the Registered Photographs to

Realtor.com knowing that it unlawfully granted rights in the Registered Photographs to Realtor.com under the Move Terms of Use that far exceeded the scope of the Limited License – namely, as pertains to Plaintiff's claim for direct infringement of his copyrights and as discussed more fully in the paragraphs below, (i) the right to publish the Registered Photographs even after termination of the listing agreements for the subject properties (which Realtor.com did with, by way of one example but not limitation, the Registered Country Club Exterior Photograph), (ii) the right to publish the Registered Photographs for purposes other than the listing and marketing of the subject properties, such as, for example, for use in third party advertising totally unrelated to the listing and marketing of the subject properties, and (iii) the unfettered right to "an irrevocable, perpetual, non-exclusive, fully paid, worldwide license to use, copy, perform, display, and distribute the Content and to prepare derivative works of, or incorporate into other works, the Content, and to grant and authorize sublicenses (through multiple tiers) of the foregoing." (Ex. G, Move Terms of Use, "Content You Provide".)

39.     On information and belief, in order to publish a photograph on Realtor.com, a party must first agree to the terms and conditions of the Peoria Area Association of Realtors' ("PAAR") Multiple Listing Service ("MLS") Rules and Regulations (the "PAAR MLS Rules and Regulations") before uploading the photographs to PAAR's online "portal," which photographs are then published on Realtor.com.

40.     On further information and belief, Defendant Honig-Bell agreed to the PAAR MLS Rules and Regulations, which PAAR MLS Rules and Regulations provide:

> By the act of submitting any property listing content to the MLS, *the participant represents that he has been authorized to grant and also thereby does grant authority for the MLS to include the property listing content in its copyrighted MLS compilation and also in any statistical report on comparables*. Listing content includes, but is not limited to, photographs, images, graphics, audio and

video recordings, virtual tours, drawings, descriptions, remarks, narratives, pricing information, and other details or information related to the listed property.

(PAAR MLS Rules and Regulations, Section 13 (emphasis added); *see also id.* at Section 13.1 ("All right, title, and interest in each copy of every multiple listing compilation created and copyrighted by the Peoria Area Association of REALTORS® (PAAR) and in the copyrights therein, shall at all times remain vested in the Peoria Area Association of REALTORS®.").) A copy of the PAAR MLS Rules and Regulations is attached as Exhibit H hereto.

41.     The rights Defendant Honig-Bell unlawfully granted to PAAR pursuant to the PAAR MLS Rules and Regulations exceed the scope of the Limited License, which permitted Defendant Honig-Bell to use the Registered Photographs only for the purposes of listing and marketing the properties, and then, only until the sale of the subject Photographed Properties. (*See* Limited License, ¶ 9 above; Usage Terms, ¶ 11 above.)

42.     Accordingly, without seeking Plaintiff's written consent, as required by the express terms of the Limited License, Defendant Honig-Bell uploaded the Registered Photographs to PAAR knowing that it unlawfully granted rights in the Registered Photographs to PAAR under the PAAR MLS Rules and Regulations that exceeded the scope of the Limited License.

## VI.     The Unauthorized Use of Registered Photographs
## Beyond the Scope of the Limited License

43.     As Defendant Honig-Bell has been aware at all relevant times by virtue of Plaintiff's Limited License and Usage Terms, and, more recently, by virtue of Plaintiff's First Amended Complaint as well, Plaintiff licensed the Registered Photographs to Honig-Bell only for the purposes of listing and marketing the properties, and then, only until the sale of the subject Photographed Property.    (*See* Limited License, ¶ 9 above; Usage Terms, ¶ 11 above.) Notwithstanding Honig-Bell's knowledge of the limited scope of its license to the Registered Photographs, and without seeking Plaintiff's written consent, as required by the express terms of

the Limited License, Honig-Bell has distributed Registered Photographs to third-parties for uses other than the pre-sale listing and marketing of Photographed Properties. By way of example and not limitation, as shown below, the Registered Country Club Exterior Photograph Plaintiff took of the Country Club Photographed Property on May 29, 2015, was previously displayed on Realtor.com as the backdrop to a "Rocket Mortgage" pop-up advertisement, despite the fact that the property was "Off Market" and, therefore, no longer being marketed:



44.     Similarly, by way of further example and not limitation, as shown on the following page, at least one of Plaintiff's Registered Photographs of the Photographed Property located at 1010 NE Glen Oak Ave., Peoria, Illinois 61603, which property has been sold, is currently being displayed on "Zillow Digs," an independent section of the Zillow website, which showcases groups of photographs of particular elements of home design and pairs them with advertising from vendors who sell goods depicted in the photographs or offer related services. In the example on the following page, the relevant elements of home design are "Polished Mahogany Traditional Staircase Design Ideas."



## VII. Defendant Honig-Bell's Removal of Plaintiff's Copyright Management Information from the Registered Photographs

45. As stated in paragraph 12 above, Plaintiff included "copyright management information," as that term is defined under 17 U.S.C. § 1202(c), as embedded data within each of the Registered Photographs ("CMI").

46. In the process of improperly distributing the Registered Photographs to third-party Zillow, Defendant Honig-Bell removed Plaintiff's CMI from such photographs in violation of 17 U.S.C. § 1202(b).

- 19 -

## VIII.  Defendant Honig-Bell's Improper Distribution of False and Altered Copyright Management Information from the Registered Photographs

47.  The examples of the Registered Country Club Exterior Photograph improperly published on Realtor.com as shown in paragraphs 25 and 43 above include the watermark "PAAR," which, on information and belief, is an acronym for the Peoria Area Association of Realtors.  The PAAR watermark, which purports to constitute CMI of the Registered Country Club Exterior Photograph, was placed on the photograph without Plaintiff's knowledge, permission, or written consent.  As such, the PAAR watermark constitutes CMI that has been altered "without authority of the copyright owner or the law" under 17 U.S.C. § 1202(b)(2).

48.  On information and belief, Defendant Honig-Bell distributed CMI of several Registered Photographs to third-party Zillow, knowing that such CMI had been altered without authority of Plaintiff or the law in violation of 17 U.S.C. § 1202(b)(2).

49.  On information and belief, based upon Defendant Honig-Bell's agreement to be bound by the terms and conditions of the PAAR MLS Rules and Regulations set forth in paragraphs 39 and 40 above, Defendant Honig-Bell knew, or had reasonable grounds to know, that prior to publication on third-party Realtor.com, Plaintiff's CMI of the Registered Country Club Exterior Photograph and other Registered Photographs would be intentionally removed from such photographs and altered without authority of Plaintiff or the law in violation of 17 U.S.C. § 1202(b)(2).

## IX.  Defendant Honig-Bell's Willful Violation of Plaintiff's Copyright Rights

50.  In or about late July or early August 2015, Plaintiff advised Ms. Yocum, the real estate agent of Defendant Honig-Bell referred to in paragraph 10 above, of the improper publication of certain of the Registered Photographs in violation of the Limited License.  At the time, Ms. Yocum acknowledged that the continued publication of Plaintiff's Registered

Photographs after a Photographed Property had been sold violated the terms of the Limited License as well as Plaintiff's copyrights. Notwithstanding Plaintiff's discussion with Ms. Yocum, Defendant Honig-Bell took no action to remedy the problem or mitigate harm to Plaintiff.

51.     Because Defendant Honig-Bell refused to take remedial action based on Plaintiff's discussions with Ms. Yocum, on August 28, 2015, Plaintiff's intellectual property attorney sent a letter to Michael Prodehl, then president and chief executive officer of Defendant Honig-Bell, outlining in detail the infringement and CMI violations described above (the "Notice Letter"). Despite having received the Notice Letter, Defendant Honig-Bell took no action to correct the problem or mitigate harm to Plaintiff. As discussed above, the infringement and CMI violations attributable to Defendant Honig-Bell continue to this day.

## X.     **Plaintiff's Additional Photographed Properties**

52.     In addition to the Registered Photographs, Plaintiff took numerous photographs in early 2015 of each of six real estate properties for agents of Defendant Honig-Bell (the "Additional Photographed Properties"). The table below includes the address of each of the Additional Photographed Properties, the date on which Plaintiff photographed each of the Additional Photographed Properties, and the number of photographs Plaintiff took of each of the Additional Photographed Properties (collectively, the "Additional Photographs"). Screenshots of the 168 Additional Photographs at issue in this action are attached as Exhibit I hereto.

| Date Created by Plaintiff | Photographed Property Address | Number of Works |
|---|---|---|
| 3/5/2015 | 130 W. Lyndale Rd., Peoria, IL | 33 |
| 3/20/2015 | 10843 N. Glenfield Dr., Dunlap, IL | 32 |
| 3/20/2015 | 1008 W. Kensington Dr., Peoria, IL | 19 |
| 1/23/2015 | 2101 W. Leyna Dr., Dunlap, IL | 31 |
| 2/3/2015 | 20 Emerald Ct., Morton, IL | 31 |
| 3/20/2015 | 5110 N. Sunnyside Ct., Peoria, IL | 22 |

53.     In connection with taking each set of Additional Photographs of the Additional Photographed Properties and providing digital copies of the same to Defendant Honig-Bell, Plaintiff granted Defendant Honig-Bell the Limited License set forth in paragraph 9 above. Plaintiff submitted invoices for the Additional Photographs to realtor Trish Yocum, who at all relevant times was employed as a real estate agent of Defendant Honig-Bell.  Each such invoice included the Limited License.  Plaintiff also provided copies of his Usage Terms and the language of his Limited License to Defendant Honig-Bell's real estate agent, Ms. Yocum, when negotiating his services relative to the Additional Photographed Properties, as set forth in paragraph 11 above.

54.     As stated in paragraph 12 above, Plaintiff included CMI, as that term is defined under 17 U.S.C. § 1202(c), as embedded data within each of the Additional Photographs.

55.     In early 2015, without seeking the written consent of Plaintiff, as required by the express terms of the Limited License, Defendant Honig-Bell distributed the Additional Photographs to several third-party websites, including, for example, Zillow, Realtor.com, https://www.trulia.com/, https://www.309realestatevalue.com/, http://www.homefinder.com/, and http://hotpad.com/, in order to advertise the Additional Photographed Properties for sale.

56.     On information and belief, in early 2015, Defendant Honig-Bell agreed to the terms and conditions of the PAAR MLS Rules and Regulations set forth in paragraphs 39 and 40 above. Accordingly, in the process of improperly distributing the Additional Photographs to PAAR, Defendant Honig-Bell knew, or had reasonable grounds to know, that Plaintiff's CMI would be intentionally removed from such photographs and altered in violation of 17 U.S.C. § 1202(b). Indeed, the PAAR watermark, which purports to constitute CMI of the Additional Photographs, was placed on the Additional Photographs and published on Realtor.com without Plaintiff's knowledge, permission, or written consent.

57.     On information and belief, *after* Plaintiff filed his First Amended Complaint for Copyright Infringement on October 14, 2016 (Dkt. #22), the Additional Photographs embedded with the PAAR watermark were improperly republished on Realtor.com.  (*See* Exhibit I.)

58.     On further information and belief, numerous of the Additional Photographs remain improperly published on Realtor.com despite the sale of the subject Additional Photographed Property.

## COUNT I – Copyright Infringement

59.     Plaintiff hereby incorporates and realleges paragraphs 1-58 above as though fully stated herein.

60.     Defendant Honig-Bell did not have permission or rights granted from Plaintiff to distribute the Registered Photographs to third-parties Zillow, Realtor.com, and/or other third-parties for any purpose that exceeded the scope of the Limited License.

61.     Defendant Honig-Bell and/or its agents reproduced, distributed, and/or displayed the Registered Photographs, or caused the Registered Photographs to be reproduced, distributed, and/or displayed in a manner that exceeded the scope of the Limited License, without the written permission of Plaintiff, as required by the Limited License and in violation of the Copyright Act, 17 U.S.C. § 101, *et seq.*  By way of example but not limitation, Defendant Honig-Bell exceeded the scope of the Limited License with respect to the Registered Photographs by, at least, (i) "grant[ing] Zillow Group an irrevocable, perpetual, royalty-free worldwide license to (a) use, copy, distribute, transmit, publicly display, publicly perform, reproduce, edit, modify, prepare derivative works of or incorporate into other works, and translate [Defendant Honig-Bell's] Submission, in connection with the Services or in any other media, and (b) sublicense these rights, to the maximum extent permitted by applicable law" (Zillow Terms of Use, ¶ 3, Ex. E); (ii)

"grant[ing], and . . . represent[ing] and warrant[ing] that [Defendant Honig-Bell] ha[s/had] the right to grant, to Move an irrevocable, perpetual, non-exclusive, fully paid, worldwide license to use, copy, perform, display, and distribute the Content and to prepare derivative works of, or incorporate into other works, the Content, and to grant and authorize sublicenses (through multiple tiers) of the foregoing" (Move Terms of Use, "Content You Provide," Ex. G); and (iii) pursuant to the improper rights granted to third-parties such as Zillow and Move as described above, distributing Registered Photographs to third-parties for uses other than the pre-sale listing and marketing of Photographed Properties, including by way of example and not limitation, distributing Registered Photographs that have been used by third-parties in pop-up advertisements, despite the fact that the subject property is "Off Market" and, therefore, no longer being marketed by Defendant Honig-Bell and/or a third-party, and distributing Registered Photographs that have been published by third-parties after the listing agreement for the subject property has been terminated. Each of the aforementioned acts, which exceed the scope of the Limited License, constitutes direct copyright infringement. *See, e.g., Boatman v. Honig Realty, Inc.*, No. 16-cv-08397, 2017 WL 3872479, at *2 (N.D. Ill. Sept. 5, 2017) ("An entity that holds a copyright license, such as Honig, can only commit copyright infringement (rather than breach of contract) if it exceeds the scope of the license.") (parenthetical in original).

62.     Defendant Honig-Bell's acts constitute willful and deliberate infringement of Plaintiff's copyrighted Registered Photographs, which infringement has caused and is causing irreparable harm and damage to Plaintiff.

63.     Plaintiff has suffered and continues to suffer financial loss as a result of Defendant Honig-Bell's conduct.

64. Plaintiff is entitled to recover from Defendant Honig-Bell the damages, including attorney's fees and costs, that Plaintiff has sustained and will sustain, and any gains, profits, and advantages obtained by Defendant Honig-Bell as a result of its acts of violation alleged above or, at Plaintiff's election, to recover statutory damages, if applicable. At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained, but will be established according to proof at trial.

## COUNT II – Contributory Copyright Infringement

65. Plaintiff hereby incorporates and realleges paragraphs 1-64 above as though fully stated herein.

66. Defendant Honig-Bell intentionally induced or encouraged third-party Zillow and/or other third-parties, including but not limited to, for example, on the Zillow.com and Realtor.com websites, to reproduce, distribute, or display the Registered Photographs beyond the scope of the Limited License, even though Defendant Honig-Bell did not have any right to do so.

67. Defendant Honig-Bell knowingly took steps that were substantially certain to result in direct infringement, including distributing the Registered Photographs to at least third-parties Zillow and Realtor.com, which did not have permission or a license to reproduce or display the Registered Photographs, knowing that at least third-parties Zillow and Realtor.com would reproduce or display the Registered Photographs beyond the scope of the Limited License and in violation of Plaintiff's copyrights.

68. Defendant Honig-Bell made a material contribution to the direct infringement of Plaintiff's copyrighted Registered Photographs by at least third-parties Zillow and Realtor.com.

69. Defendant Honig-Bell's acts constitute contributory copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101, *et seq.*

70.     Plaintiff has suffered and continues to suffer financial loss as a result of Defendant Honig-Bell's conduct.

71.     Plaintiff is entitled to recover from Defendant Honig-Bell the damages, including attorney's fees and costs, that Plaintiff has sustained and will sustain, and any gains, profits, and advantages obtained by Defendant Honig-Bell as a result of its acts of violation alleged above or, at Plaintiff's election, to recover statutory damages, if applicable.  At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained, but will be established according to proof at trial.

### COUNT III – Violation of the Digital Millennium Copyright Act
### as to Plaintiff's Registered Photographs and Additional Photographs

72.     Plaintiff hereby incorporates and realleges paragraphs 1-71 above as though fully stated herein.

73.     The Registered Photographs and Additional Photographs Plaintiff delivered to Defendant Honig-Bell in digital format contained embedded metadata identifying the copyright owner as Mike Boatman.

74.     This embedded metadata constitutes "copyright management information," as defined in 17 U.S.C. § 1202(c).

75.     Upon information and belief, Defendant Honig-Bell, without the authority of Plaintiff or the law, intentionally removed and/or altered, or caused to be removed and/or altered, the copyright management information from the Registered Photographs in the process of improperly distributing them to third-party Zillow and/or other third-parties, and/or distributed the Registered Photographs to third-party Zillow and/or other third-parties knowing that the copyright management information had been, or would be, removed and/or altered.

76.      Upon information and belief, based upon Defendant Honig-Bell's agreement to be bound by the terms and conditions of the PAAR MLS Rules and Regulations set forth in paragraphs 39 and 40 above, and without the authority of Plaintiff or the law, Defendant Honig-Bell intentionally removed and/or altered, or caused to be removed and/or altered, the copyright management information from the Additional Photographs and several Registered Photographs in the process of improperly distributing them to third-party Realtor.com and/or other third-parties, and/or distributed the Additional Photographs and several Registered Photographs to third-party Realtor.com and/or other third-parties knowing that the copyright management information had been, or would be, removed and/or altered prior to publication on third-party Realtor.com and/or other third-parties.

77.      Defendant Honig-Bell's acts violate the DMCA, 17 U.S.C. § 1202.

78.      Plaintiff has suffered and continues to suffer financial loss as a result of Defendant Honig-Bell's conduct.

79.      Plaintiff is entitled to recover from Defendant Honig-Bell the damages, including attorney's fees and costs, that Plaintiff has sustained and will sustain, and any gains, profits, and advantages obtained by Defendant Honig-Bell as a result of its acts of violation alleged above or, at Plaintiff's election, to recover statutory damages, if applicable.  At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained, but will be established according to proof at trial.

**COUNT IV – Breach of Contract**

80.      Plaintiff hereby incorporates and realleges paragraphs 1-79 above as though fully stated herein.

81.     There existed a valid and enforceable contract between Plaintiff and Defendant Honig-Bell as embodied in the Limited License included in the invoices attached as Exhibit C hereto.

82.     The Limited License allowed for limited use of the Registered Photographs and the Additional Photographs by Defendant Honig-Bell.  Defendant Honig-Bell used the Registered Photographs and the Additional Photographs outside the scope of the use granted by the Limited License.  In doing so, Defendant Honig-Bell breached the Limited License.

83.     Further, the Limited License precluded Defendant Honig-Bell from transferring or assigning its rights to the Registered Photographs and the Additional Photographs under the Limited License without the prior written consent of Plaintiff.  Plaintiff did not grant Defendant Honig-Bell prior written consent to transfer, or assign its rights to, the Registered Photographs and/or the Additional Photographs, beyond the scope of the Limited License.  Notwithstanding, Defendant Honig-Bell distributed the Registered Photographs and the Additional Photographs to third-parties Zillow, Realtor.com, and/or other third-parties for their unauthorized publication, display, and dissemination of the Registered Photographs and the Additional Photographs beyond the scope of the Limited License.  In so doing, Defendant Honig-Bell breached the Limited License.

84.     As a result of Defendant Honig-Bell's breach of the Limited License, Plaintiff has suffered and continues to suffer financial loss.

85.     Plaintiff is entitled to compensatory damages in an amount equal to financial losses suffered by Plaintiff as a result of Defendant Honig-Bell's breach of the Limited License.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Boatman respectfully asks this Court to enter judgment in Plaintiff's favor and against Defendant Honig-Bell, and against its subsidiaries, successors, parents, affiliates, officers, directors, agents, servants, employees, and all persons in active concert or participation with Defendant Honig-Bell, granting the following relief:

A.     Permanently enjoining and restraining Defendant Honig-Bell, its officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with Defendant Honig-Bell from:

(1)    reproducing, distributing, or displaying the Registered Photographs and the Additional Photographs;

(2)    contributing to or inducing any third-party to reproduce, distribute, or display the Registered Photographs and the Additional Photographs; and

(3)    removing or altering copyright management information, or distributing copyright management information that falsely identifies ownership of the copyright;

B.     Directing Defendant Honig-Bell to:

(1)    Turn over or destroy all copies, including all electronic copies, of the Registered Photographs and the Additional Photographs;

(2)    Pay to Plaintiff all the actual damages he has suffered as a result of the acts of Defendant Honig-Bell complained of herein, together with prejudgment interest;

- 29 -

(3)     Account for and pay to Plaintiff all profits derived by Defendant Honig-Bell from its acts complained of herein, together with prejudgment interest;

(4)     At Plaintiff's election, pay statutory damages based upon Defendant Honig-Bell's acts of infringement and violation of the DMCA complained of herein;

(5)     At Plaintiff's election, pay an increased award for Plaintiff's statutory damages as a result of Defendant Honig-Bell's willfully infringing acts in an amount the court deems appropriate;

(6)     Pay Plaintiff's reasonable attorney's fees and costs in this action; and

C.     Awarding Plaintiff such further relief as this Court deems just and appropriate.

## Jury Demand

Plaintiff demands a trial by jury on all issues presented in this second amended complaint.

Respectfully submitted,

Dated:  December 14, 2017

*/s/ Kyle D. Wallenberg*
Matthew G. McAndrews
Kyle D. Wallenberg
NIRO McANDREWS, LLC
200 West Madison Street, Suite 2040
Chicago, IL 60606
(312) 755-8575
Fax: (312) 674-7481
mmcandrews@niro-mcandrews.com
kwallenberg@niro-mcandrews.com

*Attorneys for Plaintiff,*
Michael Boatman

- 30 -

**EXHIBIT C**

1:20-cv-01248-JES-JEH    # 15    Page 64 of 93

E-FILED
Monday, 09 January, 2017  05:00:44 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

MICHAEL BOATMAN,

> *Plaintiff,*

v.

KEPPLE PREMIER REAL ESTATE, LLC,
THE KEPPLE TEAM, LLC, LINDA KEPPLE,
TRICIA YOCUM, JAMES M. CORKERY,
and ANN CORKERY,

> *Defendants.*

Civil Action No.: 17-cv-1009

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff MICHAEL BOATMAN, by and through undersigned counsel, pursuant to the applicable Federal Rules of Civil Procedure and the Local Rules of this Court, demands a trial by jury of all claims and issues so triable, and, for his Complaint against Defendants KEPPLE PREMIER REAL ESTATE, LLC, THE KEPPLE TEAM, LLC, LINDA KEPPLE, TRICIA YOCUM, JAMES M. CORKERY, and ANN CORKERY, hereby asserts and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Michael Boatman ("Boatman") is an individual residing in Peoria, Illinois.

2.      On information and belief, Defendant Kepple Premier Real Estate, LLC ("KPRE") is a limited liability company organized and existing under the laws of the State of Illinois, with its principal place of business at 12902 Georgetowne, Dunlap, Illinois, 61614.

KPRE may be served through its registered agent, Casey C. Kepple, at 2426 W. Cornerstone Court, Suite 209, Peoria, Illinois, 61614.

3.     On information and belief, Defendant The Kepple Team, LLC ("TKT") is a limited liability company organized and existing under the laws of the State of Illinois, with its principal place of business at 2426 W. Cornerstone Court, Suite 209, Peoria, Illinois, 61614. TKT may be served through its registered agent, Linda P. Kepple, at 2426 W. Cornerstone Court, Suite 209, Peoria, Illinois, 61614.

4.     On information and belief, Defendant Linda P. Kepple ("Kepple") is an individual residing in Peoria, Illinois.  Kepple may be served at her place of business at 2426 W. Cornerstone Court, Suite 209, Peoria, Illinois, 61614.  Kepple is a licensed real estate agent for Keller Williams Realty in Peoria, Illinois.

5.     On information and belief, Defendant Tricia Yocum ("Yocum") is an individual residing in Peoria, Illinois.  Yocum may be served at her place of business at 7555 Knoxville, Peoria, Illinois, 61614.  Yocum is a licensed real estate agent for Coldwell Banker Honig-Bell in Peoria, Illinois.

6.     On information and belief, Defendant James M. Corkery ("Mr. Corkery") is an individual currently residing in Chicago, Illinois.  Mr. Corkery may be served at his residence in Chicago, Illinois.

7.     On information and belief, Defendant Ann Corkery ("Mrs. Corkery") is an individual currently residing in Chicago, Illinois.  Mrs. Corkery may be served at her residence in Chicago, Illinois.

2

8.      This action arises under the Federal Copyright Act of 1976, as amended, 17 U.S.C. § 101 *et seq*.  This Court is vested with subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1338(a) (copyright jurisdiction).

9.      This Court has personal jurisdiction over Defendants KPRE, TKT, Kepple, Yocum, Mr. Corkery, and Mrs. Corkery (together the "Defendants") by virtue of their presence in this District and their transacting, doing, and soliciting business in this District.

10.      Venue is proper in this Court under 28 U.S.C. § 1400(a).

### OPERATIVE FACTS

11.      Boatman is a full-time professional photographer who, among other areas, specializes in interior architectural photography.

12.      In early 2015, Mr. Corkery and Mrs. Corkery (together the "Corkerys") hired Yocum to sell the residential property located at 614 West Ravinwoods Road, Peoria, Illinois, 61615 (the "Ravinwoods House").  Yocum then hired Boatman to photograph the interior and exterior of the Ravinwoods House so that she could advertise and market the house to prospective buyers.

13.      Boatman photographed the Ravinwoods House on July 15, 2015, and delivered sixty photographs (collectively the "Photographs," attached as Exhibit A) to Yocum on July 23, 2015.  An example of the Photographs is shown below:



14. Along with the delivery of the Photographs to Yocum on July 23, 2015, Boatman delivered an invoice with the following license:

> Photography for locale [*sic*] Realestate [*sic*]. Photography for listing and marketing of 614 Ravenwoods Rd, a house. Usage lease expires with the listing agreement termination. No usage rights are granted until full payment is made. Nontransferable to any 3rd party for any reason without prior written consent from the author and copyright owner Mike Boatman. Mike Boatman maintains full and complete ownership of images.

15. Boatman included metadata embedded in each of the digital files of the Photographs that identified Boatman as the author and copyright owner of the Photographs, including his name, address, email address, phone number, website, and a copyright notice reading "© Mike Boatman 2015" (the "Boatman Metadata"). The DVD Boatman delivered to Yocum with the Photographs also included a hand-written copyright notice on its face, reading "© Mike Boatman 2015," identifying Boatman as the copyright owner of the Photographs.

16. Pursuant to the license from Boatman, Yocum displayed thirty-eight of Boatman's photographs on her company's listing of the Ravinwoods House.

4

17.     On information and belief, the Corkerys terminated their listing agreement with Yocum and her company, Coldwell Banker Honig-Bell, in early September 2015, and hired Kepple, KPRE, and TKT (together the "Kepple Team") to list the Ravinwoods House for sale.

18.     On information and belief, the Corkerys requested that the Kepple Team again use photographs by Boatman to assist in the sale of the property.

19.     On or around September 9, 2015, Kepple called Boatman to inform him that the Corkerys hired the Kepple Team to list the Ravinwoods House for sale.  During this call, Kepple asked Boatman to take new photographs of the Ravinwoods House for the new listing.  While Kepple knew that Boatman took the photographs Yocum used in the prior listing, she had been notified when previously working with Boatman that he did not share photographs of properties with different agents.

20.     During this phone call, Boatman explained to Kepple that due to recent infringement of his photographs in the local real estate market, he was no longer photographing houses or providing photographs for agents to use in listings.  He also informed Kepple during this call that he was specifically concerned with requirements by the local listing service, Peoria Area Association of REALTORS ("PAAR"), that realtors transfer copyrights of uploaded photographs to PAAR even though the agents do not have authority to do so.

21.     On information and belief, Kepple informed the Corkerys that Boatman was no longer providing photographs for use in real estate listings.

22.     On information and belief, the Corkerys then contacted Yocum and inquired whether the Photographs could be purchased from her.

23.     On information and belief, Yocum sold the Photographs to the Corkerys for $400.

24.     On information and belief, the Corkerys then immediately sold the Photographs to Kepple for $400.

25.     On or around September 15, 2016, Boatman discovered that the Kepple Team uploaded thirty-five of the Photographs to PAAR for display in the Kepple Team's listing for the Ravinwoods House.  The Kepple Team's distribution to PAAR resulted in the creation and distribution of copies of thirty-five of the Photographs (the "Infringing Copies," attached as Exhibit B) without any of the Boatman Metadata, and with a large visible watermark reading "PAAR" (the "Watermark") as shown below:



26.     The Kepple Team displayed the Infringing Copies on at least the following websites:

6

- http://www.kw.com/homes-for-sale/61615/IL/Peoria/614-W-RAVINWOODS-Road/3yd-PAARIL-1166457.html;
- http://idx.keppleteam.com/idx/details/listing/a122/1166457/614-W-RAVINWOODS;
- http://www.zillow.com/homes/614-West-Ravinwoods-Road,-Peoria,-Illinois-61615_rb/;
- http://www.realtor.com/realestateandhomes-detail/614-W-Ravinwoods-Rd_Peoria_IL_61615_M87009-29663;
- http://www.century21.com/property/614-w-ravinwoods-road-peoria-il-61615-REN020469394; and
- http://www.homefinder.com/IL/Peoria/614-W-Ravinwoods-Rd-126730954d.

27.     The Kepple Team never identified Boatman as the author or copyright owner of the Infringing Copies.

28.     Boatman is not and never has been an employee of either Coldwell Banker Honig-Bell or Yocum, and no written instrument considers or has ever considered the Photographs to be a work made for hire pursuant to 17 U.S.C § 101. Accordingly, the Photographs were not works made for hire, and the copyrights to the Photographs vested in and remain with Boatman.

29.     The Photographs in perspective, orientation, positioning, lighting, and other details are entirely original, distinctive, and unique. As such, the Photographs are subject matter protectable under the Copyright Act.

30.     Boatman never authorized Yocum to sell or otherwise distribute the Photographs to any third party.

31.     Boatman never authorized the Corkerys to sell or otherwise distribute the Photographs to any third party.

32.     Boatman never authorized the Kepple Team to reproduce, distribute, display, or make derivative works of any of the Photographs or the Infringing Copies.

33.     Boatman is and always has been the proprietor of the right, title, and interest in and to the copyrights for the Photographs. Boatman is the author and copyright owner of the Photographs pursuant to 17 U.S.C. § 201.

34.     Boatman has fully complied with the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, as amended, and all other laws and regulations governing copyrights and has secured the exclusive rights and privileges in and to the copyrights for the Photographs.

35.     The Register of Copyrights for the U.S. Copyright Office issued to Boatman a Certificate of Registration for the copyrights to the Photographs, number VA 1-964-052, effective July 28, 2015, as shown as Exhibit C.

36.     On October 9, 2015, Boatman, through counsel, sent a letter by mail and email to the Kepple Team providing notice that the Infringing Copies were being displayed without authorization of Boatman or the law and presenting an offer to settle.

37.     The Kepple Team disclaimed liability and never engaged in settlement discussions.

## FIRST CAUSE OF ACTION

(Copyright Infringement - 17 U.S.C. § 101 *et seq.*)

38.     Boatman re-alleges and incorporates by reference paragraphs 1 through 37 above.

39.     Yocum did not have authorization of Boatman or the law to reproduce or distribute the Photographs.

40.     Without authorization of Boatman or the law, Yocum sold and distributed the Photographs to the Corkerys for their commercial use (collectively, the "Yocum Infringements").

41.     Yocum has not compensated Boatman for the Yocum Infringements.

42.     Yocum's conduct violates the exclusive rights belonging to Boatman as owner of the copyrights for the Photographs, including without limitation, Boatman's exclusive rights under 17 U.S.C. § 106.

43.     As the Yocum Infringements occurred, upon information and belief, in or about September 2015, Boatman's claims are within the three-year statute of limitations period pursuant to 17 U.S.C. § 507(b).

44.     As a direct and proximate result of her wrongful conduct, Yocum realized and continues to realize profits and other benefits rightfully belonging to Boatman for the Photographs.  Accordingly, Boatman seeks an award of actual damages and profits pursuant to 17 U.S.C. § 504(b).

45.     In the alternative, Boatman is entitled to and seeks statutory damages for the Yocum Infringements, including attorneys' fees and costs, pursuant to 17 U.S.C. §§ 504(c)(1) and 505.

46.     The Yocum Infringements were willful and performed with knowledge that the reproduction and distribution of the Photographs was unauthorized; Boatman is therefore entitled to the recovery of enhanced statutory damages pursuant to 17 U.S.C. § 504(c)(2).

## SECOND CAUSE OF ACTION

(Copyright Infringement - 17 U.S.C. § 101 *et seq.*)

47.     Boatman re-alleges and incorporates by reference paragraphs 1 through 46 above.

48.     The Corkerys did not have authorization of Boatman or the law to reproduce or distribute the Photographs.

49.     Without authorization of Boatman or the law, the Corkerys sold and distributed the Photographs to the Kepple Team for their commercial use (collectively, the "Corkery Infringements").

50.     The Corkerys have not compensated Boatman for the Corkery Infringements.

51.     The Corkerys' conduct violates the exclusive rights belonging to Boatman as owner of the copyrights for the Photographs, including without limitation, Boatman's exclusive rights under 17 U.S.C. § 106.

52.     As the Corkery Infringements occurred, upon information and belief, in or about September 2015, Boatman's claims are within the three-year statute of limitations period pursuant to 17 U.S.C. § 507(b).

53.     As a direct and proximate result of their wrongful conduct, the Corkerys realized and continue to realize profits and other benefits rightfully belonging to Boatman for the Photographs.  Accordingly, Boatman seeks an award of actual damages and profits pursuant to 17 U.S.C. § 504(b).

54.     In the alternative, Boatman is entitled to and seeks statutory damages for the Corkery Infringements, including attorneys' fees and costs, pursuant to 17 U.S.C. §§ 504(c)(1) and 505.

55.     The Corkery Infringements were willful and performed with knowledge that the reproduction and distribution of the Photographs was unauthorized; Boatman is therefore entitled to the recovery of enhanced statutory damages pursuant to 17 U.S.C. § 504(c)(2).

### THIRD CAUSE OF ACTION

(Copyright Infringement - 17 U.S.C. § 101 *et seq.*)

56.     Boatman re-alleges and incorporates by reference paragraphs 1 through 55 above.

57.     The Kepple Team did not have authorization of Boatman or the law to reproduce, distribute, display, or make derivative works of the Photographs.

58.     Without authorization of Boatman or the law, the Kepple Team reproduced and created derivative works of the Photographs, then distributed the Infringing Copies and caused them to be displayed on multiple websites for the commercial marketing of the Ravinwoods House (collectively, the "Kepple Infringements").

59.     The Kepple Team has not compensated Boatman for the Kepple Infringements.

60.     The Kepple Team's conduct violates the exclusive rights belonging to Boatman as owner of the copyrights for the Photographs, including without limitation, Boatman's exclusive rights under 17 U.S.C. § 106.

61.     As the Kepple Infringements occurred, upon information and belief, in or about September 2015, Boatman's claims are within the three-year statute of limitations period pursuant to 17 U.S.C. § 507(b).

62.     As a direct and proximate result of their wrongful conduct, the Kepple Team realized and continues to realize profits and other benefits rightfully belonging to Boatman for the Infringing Copies.  Accordingly, Boatman seeks an award of actual damages and profits pursuant to 17 U.S.C. § 504(b).

63.     In the alternative, Boatman is entitled to and seeks statutory damages for the Kepple Infringements, including attorneys' fees and costs, pursuant to 17 U.S.C. §§ 504(c)(1) and 505.

64.     The Kepple Infringements were willful and performed with knowledge that the reproduction and distribution of the Infringing Copies was unauthorized; Boatman is therefore entitled to the recovery of enhanced statutory damages pursuant to 17 U.S.C. § 504(c)(2).

## FOURTH CAUSE OF ACTION

(False Copyright Management Information – 17 U.S.C. § 1202 *et seq.*)

65.     Boatman re-alleges and incorporates by reference paragraphs 1 through 64 above.

66.     The Watermark constitutes copyright management information pursuant to 17 U.S.C. § 1202(c)(2), (3), and (7).

67.     The Kepple Team, without the authority of Boatman or the law, knowingly and with the intent to induce, enable, facilitate, or conceal infringement, provided copyright management information that is false and distributed the Photographs with copyright management information that is false, in violation of 17 U.S.C. § 1202(a).

68.     As a direct and proximate result of the Kepple Team's wrongful conduct, Boatman has suffered damages and so is entitled to the remedies set forth under 17 U.S.C. § 1203.

69.     Specifically, Boatman is entitled to and seeks actual damages pursuant to 17 U.S.C. § 1203(c)(2) for each violative act.

70.     In the alternative, Boatman is entitled to and seeks statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(B) for each violative act, and costs of litigation and attorneys' fees pursuant to 17 U.S.C. § 1203(b)(4)-(5).

## FIFTH CAUSE OF ACTION

(Removal or Alteration of Copyright Management Information – 17 U.S.C. § 1202 *et seq.*)

71.     Boatman re-alleges and incorporates by reference paragraphs 1 through 70 above.

72.     The Boatman Metadata constitutes copyright management information pursuant to 17 U.S.C. § 1202(c)(2), (3), and (7).

73.     Upon information and belief, the Kepple Team, without the authority of Boatman or the law, intentionally removed Boatman's copyright management information and displayed and distributed the Photographs on at least six distinct and separate web sites, knowing that Boatman's copyright management information had been removed and knowing or having reasonable grounds to know that such removal or alteration would induce, enable, facilitate, or conceal a copyright infringement, in violation of 17 U.S.C. § 1202(b).

74.     As a direct and proximate result of the Kepple Team's wrongful conduct, Boatman has suffered damages and so is entitled to the remedies set forth under 17 U.S.C. § 1203.

75.     Specifically, Boatman is entitled to and seeks actual damages pursuant to 17 U.S.C. § 1203(c)(2) for each act of removal and display.

76.     In the alternative, Boatman is entitled to and seeks statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(B), and costs of litigation and attorneys' fees pursuant to 17 U.S.C. § 1203(b)(4)-(5).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Boatman prays that this Honorable Court:

1.     Order that Yocum's unauthorized conduct violates Boatman's rights under the Federal Copyright Act at 17 U.S.C. §101 *et seq.*;

2.     Order Yocum to account to Boatman for all gains, profits, and advantages derived from the unauthorized use of the Photographs;

3.     Award Boatman all profits and damages from Yocum in such amount as may be found pursuant to 17 U.S.C. § 504(b) (with interest thereon at the highest legal rate) for the infringements of Boatman's copyrights in the Photographs;

alternatively, maximum statutory damages in the amount of $30,000 for each of the Yocum Infringements pursuant to 17 U.S.C. § 504(c)(1); or such other amount as may be proper pursuant to 17 U.S.C. § 504;

4. Alternatively, award Boatman maximum statutory damages from Yocum in the amount of $150,000 for each willful violation of 17 U.S.C. § 106 pursuant to 17 U.S.C. § 504(c)(2), or such other amount as may be proper pursuant to 17 U.S.C. § 504;

5. Order that the Corkerys' unauthorized conduct violates Boatman's rights under the Federal Copyright Act at 17 U.S.C. §101 *et seq.*;

6. Order the Corkerys to account to Boatman for all gains, profits, and advantages derived from the unauthorized use of the Photographs;

7. Award Boatman all profits and damages from the Corkerys in such amount as may be found pursuant to 17 U.S.C. § 504(b) (with interest thereon at the highest legal rate) for the infringements of Boatman's copyrights in the Photographs; alternatively, maximum statutory damages in the amount of $30,000 for each of the Corkery Infringements pursuant to 17 U.S.C. § 504(c)(1); or such other amount as may be proper pursuant to 17 U.S.C. § 504;

8. Alternatively, award Boatman maximum statutory damages from the Corkerys in the amount of $150,000 for each willful violation of 17 U.S.C. § 106 pursuant to 17 U.S.C. § 504(c)(2), or such other amount as may be proper pursuant to 17 U.S.C. § 504;

9. Order that the Kepple Team's unauthorized conduct violates Boatman's rights under the Federal Copyright Act at 17 U.S.C. §101 *et seq.*;

10.     Order the Kepple Team to account to Boatman for all gains, profits, and advantages derived from the unauthorized use of the Infringing Copies;

11.     Award Boatman all profits and damages from the Kepple Team in such amount as may be found pursuant to 17 U.S.C. § 504(b) (with interest thereon at the highest legal rate) for the infringements of Boatman's copyrights in the Infringing Copies; alternatively, maximum statutory damages in the amount of $30,000 for each of the Kepple Infringements pursuant to 17 U.S.C. § 504(c)(1); or such other amount as may be proper pursuant to 17 U.S.C. § 504;

12.     Alternatively, award Boatman maximum statutory damages from the Kepple Team in the amount of $150,000 for each willful violation of 17 U.S.C. § 106 pursuant to 17 U.S.C. § 504(c)(2), or such other amount as may be proper pursuant to 17 U.S.C. § 504;

13.     Award Boatman actual damages suffered and profits for each violation of 17 U.S.C. § 1202(a) pursuant to 17 U.S.C. § 1203(c)(2) (with interest thereon at the highest legal rate); or such other amount as may be proper pursuant to 17 U.S.C. § 1203;

14.     In the alternative, if Boatman so elects, award Boatman maximum statutory damages in the amount of $25,000 for each unauthorized violation of 17 U.S.C. § 1202(a) pursuant to 17 U.S.C. § 1203(c)(3)(B), or such other amount as may be proper pursuant to 17 U.S.C. § 1203;

15.     Award Boatman actual damages suffered and profits for each violation of 17 U.S.C. § 1202(b) pursuant to 17 U.S.C. § 1203(c)(2) (with interest thereon at the

highest legal rate); or such other amount as may be proper pursuant to 17 U.S.C. 1203;

16.    In the alternative, if Boatman so elects, award Boatman maximum statutory damages in the amount of $25,000 for each unauthorized violation of 17 U.S.C. § 1202(b) pursuant to 17 U.S.C. § 1203(c)(3)(B), or such other amount as may be proper pursuant to 17 U.S.C. § 1203;

17.    Award Boatman his costs of litigation, reasonable attorneys' fees, and disbursements in this action pursuant to 17 U.S.C. §§ 505 and 1203;

18.    Order Defendants to deliver to Boatman all copies of the Photographs and all other materials containing such infringing copies of the Photographs in their possession, custody, or control;

19.    Order Defendants, their agents, and servants to be enjoined during the pendency of this action and permanently from infringing the copyrights of Boatman in any manner and from reproducing, distributing, displaying, or creating derivative works of the Photographs; and

20.    For such other and further relief as this Honorable Court deems just and proper.


**JURY DEMAND**

Boatman demands a trial by jury on all issues so triable.


Respectfully submitted, this 9th day of January, 2017.


                                    /s/ Matthew G. McAndrews
                                    Matthew G. McAndrews
                                    Kyle D. Wallenberg

16

NIRO McANDREWS, LLC
200 West Madison Street, Suite 2040
Chicago, IL 60606
(312) 755-8575
Fax: (312) 674-7481
mmcandrews@niro-mcandrews.com
kwallenberg@niro-mcandrews.com

*Attorneys for Plaintiff,*
Michael Boatman

**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL BOATMAN, an individual, | |
| Plaintiff, | Case No. 1:16-cv-08397 |
| v. | Judge John J. Tharp, Jr. |
| | Magistrate Judge Maria Valdez |
| HONIG REALTY, INC. d/b/a COLDWELL BANKER HONIG-BELL, | |
| Defendant. | |

## **STIPULATION OF DISMISSAL WITH PREJUDICE**

Pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, Plaintiff, Michael Boatman ("Plaintiff"), and Defendant, Honig Realty, Inc. d/b/a Coldwell Banker Honig-Bell ("Defendant"), having entered into a mutually agreeable resolution of all claims asserted in the above-referenced action, hereby stipulate to the dismissal of Plaintiff's claims against Defendant with prejudice. Each party agrees to bear its own costs and attorney fees.

Respectfully submitted,

/s/ Matthew G. McAndrews
Matthew G. McAndrews
Kyle D. Wallenberg
NIRO McANDREWS, LLP
200 W. Madison St., Suite 2040
Chicago, IL 60606
(312) 755-8575
Fax: (312) 674-7481
mmcandrews@niro-mcandrews.com
kwallenberg@niro-mcandrews.com

*Attorneys for Plaintiff*

/s/ Michael A. Parks
Michael A. Parks (IL 6217230)
Anthony F. Blum (IL 6298243)
Justin P. Mulligan (IL 265915)
55 East Monroe Street, 37th Floor
Chicago, Illinois 60603
(312) 580-2237
Fax: 312-580-2201
mparks@thompsoncoburn.com
ablum@thompsoncoburn.com
jmulligan@thompsoncoburn.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 7, 2018 the foregoing

## STIPULATION OF DISMISSAL WITH PREJUDICE

was filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following counsel of record.

Michael A. Parks
Anthony F. Blum
Justin P. Mulligan
55 East Monroe Street, 37th Floor
Chicago, Illinois 60603
(312) 580-2237
Fax: 312-580-2201
mparks@thompsoncoburn.com
ablum@thompsoncoburn.com
jmulligan@thompsoncoburn.com

I certify that all parties in this case are represented by counsel who are CM/ECF participants.

*/s/ Matthew G. McAndrews*
*Attorney for Plaintiff,*
NIRO McANDREWS, LLP

**EXHIBIT E**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL BOATMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-CV-08397 |
| | ) | |
| HONIG REALTY, INC. d/b/a | ) | Judge John J. Tharp, Jr. |
| COLDWELL BANKER HONIG-BELL | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Honig Realty Inc. sells houses. Plaintiff Michael Boatman is a professional photographer who photographed several houses for Honig. Boatman alleges that Honig infringed his copyrights in the photographs by posting them on a number of real estate websites and altering his copyright management information. Honig has moved to dismiss all the counts of the complaint except for the breach of contract claim. For the reasons explained below, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

As required when considering a motion to dismiss, the Court takes all well-pleaded allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *See Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 492-93 (7th Cir. 2011). Plaintiff Michael Boatman is a professional photographer living in Peoria, Illinois. Am. Compl. ("Compl.") ¶ 2. In 2015, Boatman was hired by defendant Honig Realty Inc. ("Honig") to take photographs of nine homes Honig was trying to sell. *Id.* at ¶ 6. Boatman took the photographs and registered each photograph with the U.S. Register of Copyrights. *Id.* When Boatman sent Honig the photographs, they contained embedded information listing his name, personal information, copyright, and the year. *Id.* at ¶ 12.

Boatman granted Honig a license which allowed Honig to use the photographs for the "listing and marketing" of the homes, with the license expiring when the listing agreement was terminated (*i.e.*, when the property sold). *Id*. at ¶ 9. The license also stated that "No usage rights are granted until full payment is made. Nontransferable to any 3rd party for any reason without prior written consent from the author and copyright owner Mike Boatman." *Id*. On a different document that Boatman included as a part of his photography proposal, he stated that the photograph usage rights were "restricted to the marketing of the listed property" and that the "[u]sage lease is nontransferable to 3rd parties." Compl. ¶ 11.

Honig uploaded the photographs to Zillow, a popular real estate website, "in order to advertise the Photographed Properties for sale." *Id*. at ¶ 13. Honig also uploaded some photographs to other real estate websites to advertise the properties, such as Realtor.com. *Id*. at ¶ 20. At least some of the photographs remained up on Zillow and Realtor.com after the properties were sold, despite the websites no longer having active listings for those properties. *See id.* at ¶¶ 14, 21. On July 23, 2015, Boatman spoke to two of Honig's employees about their uploading of the photographs to Zillow, although it is not clear that he voiced any complaints regarding the photographs appearing on Zillow. *See id.* at ¶ 15. Honig notes that pop-up advertisements sometimes appear when visiting the Realtor.com pages featuring the photographs. *See* Compl. ¶ 27. Zillow has also taken at least one photograph and used it on another segment of the website, called "Zillow Digs," which showcases certain home features. *Id*. at ¶ 28.

Boatman also complains that Honig "intentionally removed" the copyright management information ("CMI") that he had embedded in the file. *Id*. at ¶ 51. He further alleges that Honig added a watermark reading "PAAR," which he believes is an acronym for the Peoria Area

Association of Realtors. *Id*. at ¶ 31. At least one of the photographs in the complaint shows a PAAR watermark on a photograph in a Realtor.com listing. *Id*. at ¶ 20.

Boatman twice attempted to contact Honig regarding what he believed was the improper use of his photographs. In summer 2015, Boatman called one of Honig's real estate agents and informed her "of the improper publication of certain of the Registered Photographs." Compl. ¶ 33. The agent allegedly agreed that the use of the photographs violated the terms of the lease and Boatman's copyright, but Honig took no action in response. *Id*. On August 28, 2015, Boatman's lawyer sent a letter to Honig's president "outlining in detail the infringement and CMI violations described above," but Honig allegedly "took no action to correct the problem or mitigate the harm." *Id*. at ¶ 34.

Boatman filed this lawsuit on August 26, 2016 and amended his complaint on October 17, 2016. The current complaint brings four claims: direct copyright infringement, contributory copyright infringement, violation of the Digital Millennium Copyright Act ("DMCA") (17 U.S.C. § 1202), and breach of contract. Honig has moved to dismiss the first three counts.

## DISCUSSION

Honig raises a number of reasons why Boatman has failed to state a claim under Rule 12(b)(6). As an initial matter, it objects that Boatman has "pled no facts" that Honig had knowledge or intent with regard to its alleged contributory infringement or DMCA violations. *See* Def.'s Mem. at 6, 8. Knowledge and intent, however, "may be pleaded generally (which is to say, in a conclusory fashion)." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). Boatman has generally alleged that Honig knew its actions "were substantially certain to result in direct infringement" and that it "intentionally removed" the relevant CMI.[1] Compl. at ¶¶ 43, 51. Those

---

[1] It is true that the DMCA requires that a defendant have intentionally removed the information "knowing" or "having reasonable grounds to know" that such action "will induce,

allegations are sufficient at this stage. With that concern addressed, the Court moves on to the substantive objections to Boatman's claims.

**I. Direct Infringement**

An entity that holds a copyright license, such as Honig, can only commit copyright infringement (rather than breach of contract) if it exceeds the scope of the license. *See Bergt v. McDougal Littell*, 661 F. Supp. 2d 916, 921 (N.D. Ill. 2009) (*citing I.A.E., Inc. v. Shaver,* 74 F.3d 768, 775 (7th Cir. 1996)). Copyright licenses are to be construed like any other contracts and interpreted under state law. *Automation by Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749, 753 (7th Cir. 2006). Honig argues that its conduct (uploading the photographs to Zillow and Realtor.com to market the properties) falls squarely within the license which was explicitly for "listing and marketing" the properties. *See* Def.'s Mem. at 4. Boatman claims that because the lease states it is "[n]ontransferable" without Boatman's consent, distributing the photographs to any third party (even for listing and marketing) was outside the scope of the lease.[2] *See* Pl.'s Resp. at 4.

"The interpretation of an unambiguous contract is a question of law that can be decided at the motion to dismiss stage." *Golden v. Wiznitzer*, No. 13 C 9003, 2014 WL 1329397, at *1 (N.D. Ill. Apr. 2, 2014) (*citing De Lage Landen Fin. Servs., Inc. v. M.D.M. Leasing Corp.*, No. 07 C 0045, 2007 WL 4355037, at *2 (N.D. Ill. Dec. 10, 2007)). "A contract is ambiguous only

---

enable, facilitate, or conceal an infringement." 17 U.S.C. § 1202(b). Boatman's complaint does not use those exact words. The Court, however, finds it is a reasonable inference at this stage that *intentionally* removing all indicators of Boatman's identity and copyright plausibly would have provided "reasonable grounds to know" that such an action would facilitate or conceal infringement.

[2] In his response, Boatman appears to attempt to include Zillow and Realtor.com's continued use of the photographs after the listings were removed as a part of Honig's direct conduct. *See* Pl.'s Resp. at 5-6. The complaint, however, does not allege that Honig had anything to do with the photographs' continued appearance on the site or their migration to new areas of the websites.

where a reasonable person could find its terms susceptible to more than one interpretation." *Automation by Design, Inc.*, 463 F.3d at 754. When encountering similar language regarding a "non-transferable" license, the Seventh Circuit found the language "unambiguously" meant that the licensee's rights could not be transferred. *Id*. at 755. The Seventh Circuit rejected the understanding that the "non-transferable" language meant that the physical designs could not be transferred to a third party to effectuate the purpose of the license. *See also Klein v. Caremark Int'l*, 329 Ill. App. 3d 892, 907 (2002) (rejecting contract interpretation that would "frustrate the entire purpose of the Agreement").

The situation is identical here. The only reasonable interpretation of the license is that Honig could not transfer ***the license itself*** to a third party. It does not prevent Honig from distributing the photographs for the stated purposes of listing and marketing the homes. The complaint concedes that when Honig uploaded the photographs to the websites, it was doing so to advertise the properties. Therefore, Honig acted within the scope of its license when it uploaded the photographs and did not directly infringe Boatman's copyright. The motion to dismiss the direct infringement claim is granted.

### II. Contributory Infringement

Honig next argues that the contributory infringement claim is also within the scope of the license. The license, however, clearly states that it expires at the termination of the listing agreement. *See* Compl. ¶ 9. Boatman's complaint is that the photographs remained on the websites after the relevant listing agreements were terminated. *See, e.g., id.* at ¶ 14. Therefore, Boatman has alleged conduct that would fall outside the temporal scope of the license and could constitute infringement.

Honig next argues that Boatman has failed to allege Honig's knowledge that Zillow or Realtor.com would engage in infringing conduct. As discussed above, the Court must accept the facts of the complaint at this stage and the complaint currently pleads such knowledge with sufficient particularity. *See id*. at ¶ 43. Although Honig may very well be correct that it lacked knowledge at the relevant time, *see* Def.'s Reply at 7, Boatman is not required to plead the specifics of what knowledge Honig had or when it gained that knowledge at this stage. Therefore, the motion to dismiss the claim for contributory infringement is denied.

### III. DMCA Violation

Boatman has pled two different incidents that might violate the DMCA – the removal of his CMI (copyright management information) and the addition of the PAAR watermark. As discussed above, Boatman has sufficiently pled Honig's intent and knowledge and Boatman has at least raised the inference that Honig should have known the removal of CMI would facilitate copyright infringement. Honig raises no other reasons the removal of the embedded CMI claim cannot go forward.

In a footnote to its motion, Honig asserts that the watermark allegation cannot be a violation of § 1202(b) because that section covers only the removal or alteration of CMI while § 1202(a) covers the addition of false copyright information. *See* Def.'s Mem. at 8, fn. 2. At least one court has allowed a § 1202(b) claim that a watermark was added to move past a motion to dismiss when the copyright owner had included a different watermark on the original image. *See Goldstein v. Metro. Reg'l Info. Sys., Inc.*, No. CV TDC-15-2400, 2016 WL 4257457, at *9 (D. Md. Aug. 11, 2016). That court found that § 1202(a) would cover cases "where false CMI was added to an image that otherwise had no CMI." *Id*. A court in this district rejected a § 1202(b) claim (and allowed a § 1202(a) claim) when a false watermark was added to a photograph that

did not otherwise contain CMI. *See Merideth v. Chicago Tribune Co., LLC*, No. 12 C 7961, 2014 WL 87518, at *3 (N.D. Ill. Jan. 9, 2014).

This case obviously falls in between the situations described above. The complaint alleges that CMI in one form was originally attached to the photograph, and that Honig removed that CMI and replaced it with a different form of (inaccurate) CMI.[3] The question therefore becomes whether new CMI of a different nature still qualifies as an alteration under § 1202(b) or whether it is an addition under § 1202(a).

The Court finds that Boatman has stated a claim under § 1202(b). While a plaintiff perhaps could split an alteration claim into two pieces – a removal claim under § 1202(b) and then an addition claim under § 1202(a) – the fact that the statute plainly includes alterations in § 1202(b) suggests such contortions are not required. If Boatman had included a note at the bottom of his photographs reading "by Mike Boatman" and Honig had altered note to read "by PAAR" (or "by Honig"), that would be an alteration in violation of § 1202(b). Similarly, if Boatman had included his "by Mike Boatman" note and Honig had changed it to "© Honig Realty," that would surely also constitute an alteration even though arguably the CMI is of different type (one identifies author, the other identifies a copyright holder). The Court has no trouble extending that logic such that Honig removing embedded CMI and replacing it with contradictory watermarked CMI is still an alteration. Therefore, the motion to dismiss the

---

[3] By statute, CMI includes "[t]he name of, and other identifying information about, the author of a work" and "[t]he name of, and other identifying information about, the copyright owner of the work." 17 U.S.C. § 1202(c). The parties do not appear to contest that identifying PAAR as the author or copyright owner via a watermark constitutes CMI.

DMCA count is denied.[4] Adding inconsistent information to the existing CMI "alters" the existing CMI.

*      *      *

For the reasons stated above, the motion to dismiss is granted as the Count I (direct infringement) and denied as to Counts II (contributory infringement) and III (DMCA violation).

Dated: September 5, 2017

John J. Tharp, Jr.
United States District Judge

---

[4] The Court further notes that a plaintiff is not required to plead legal theories in his complaint. *See Whitaker v. Milwaukee County*, 772 F.3d 802, 808 (7th Cir. 2014) ("it is factual allegations, not legal theories, that must be pleaded in a complaint"). To the extent that Boatman should have laid out the watermark as a separate claim under § 1202(a) rather than as part of an alteration claim under § 1202(b), that does not warrant dismissal of his claim because he has pled sufficient facts to state his claim.

## Certificate of Service

I hereby certify that on October 13, 2020, a copy of the foregoing document was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Thomas G. Griffin